Stokes *v.* Anderson *et al.*

No. 12,704.

## STOKES *v.* ANDERSON ET AL.

WRITTEN INSTRUMENT.—*Delivery.*—*What Does not Constitute.*—S. signed a deed, bill of sale and promissory note, and left them upon the table. He neither said nor did anything to indicate an intention to deliver them; on the contrary, the circumstances show that he did not want to execute the writings at that time. He reserved the right to examine them on the next day, and it was agreed that if they were found incorrect, corrections should be made. While the papers were so lying upon the table, one of the persons named therein took them up and gave them to his clerk, with instructions to put them in his vault.

*Held*, that there was no delivery.

SAME.—*Illegal Consideration.*—*Husband and Wife.*—*Divorce.*—*Collusive Agreement to Obtain.*—Writings executed by a husband for the benefit of his wife, in pursuance of a collusive agreement between them, whereby the wife is to institute a divorce proceeding for a cause which does not exist, thus abandoning a cause which she claims to exist, and the husband will not resist the proceeding, but will aid in procuring the divorce to be granted, are upon an illegal consideration, and not enforceable.

From the St. Joseph Circuit Court.

*W. G. George, A. C. Harris, W. H. Calkins* and *J. H. Baker*, for appellant.

*A. Anderson* and *L. Hubbard*, for appellees.

BERKSHIRE, J.—The complaint alleges that the appellant is now, and was on the 6th day of March, 1885, the owner of certain lots in the city of South Bend, and of certain real estate, all in St. Joseph county, State of Indiana, and of the south one-third of lot 114 in the town of Goshen, county of Elkhart, State of Indiana, all of the value of $9,000, subject to existing encumbrances, and is not, and was not, the owner of any other real estate. On the 6th day of March, 1885, and for twenty-four years theretofore, he was the husband of the appellee Susan M. Stokes, and still is her husband; that he and his said wife had lived together amicably from the time of their marriage until the said date named, that he

knew of no unkind feeling existing between them, and knows of none at this time. At that date she was the owner of real estate in said county of St. Joseph of the value of $10,000; that his real estate was encumbered to the amount of about $12,500, and hers to the amount of $2,700, which was to secure his debt. On the 5th day of March, 1885, the appellant's said wife, with his consent, left their home to spend the day with her aunt, intending to return about 5 o'clock in the evening; that within about four hours after her departure, the appellee Anderson came to the residence of the appellant and informed him that his wife would not return, and intended immediately to apply for a divorce, and that unless he at once made a settlement with said Anderson in behalf of his said wife he should be ruined financially; that said Anderson is the uncle of the appellant's said wife, and has great and undue influence over her, and possessed such influence at the time of said conversation with the appellant; and being ignorant of any grievance on the part of his said wife, appellant has endeavored to communicate with her for the purpose of ascertaining the cause of her abandonment of her home, but has been refused admission to the house of Mrs. Mary Harris, where she is stopping, all of which is the result of the wrongful interference and undue influence of said Anderson. On the said 5th day of March, 1885, having made the statements and threats as stated, and having been the confidential adviser of the appellant, and in whom he had full confidence, the said Anderson caused appellant to accompany him to his law office in said city of South Bend (he being then and now a prominent attorney in said city), and insisted that a divorce must be procured for appellant's wife, and that property arrangements must be made for her benefit; that at said office appellant met the appellee Hubbard, who had been summoned by the said Anderson, and who, appellant was induced to believe, would act as his attorney; that the said Anderson had at that time great influence over the appellant, and said Hubbard was known to

him as a prominent attorney of said city; that at that time, and for some days theretofore, the said Hubbard was and had been acting as the attorney of the appellant's said wife in conjunction with the said Anderson, under an employment from him, all of which was unknown to the appellant; that, relying upon the representations of the said Anderson, and being in ignorance of the practice and rules of law, he, on the 6th day of March, 1885, signed and delivered to said Anderson, in escrow, his promissory note for $9,000, without consideration, to be held in anticipation of the granting of a divorce between the appellant and his said wife in an action for divorce which the said Anderson was to cause to be instituted in her name, not as the result of any arrangement between the appellant and his wife, but which said Anderson demanded in her name, professing to act as her attorney; that no opportunity was given the appellant to take counsel as to his legal rights (of which he was wholly ignorant), the said Anderson insisting that matters must be closed up immediately, and demanded that a deed be made by the appellant conveying, in trust for his said wife's benefit, to the appellees Hubbard and Matthews, all of his real estate, and threatened his financial ruin if his (Anderson's) wishes were not complied with; and being unable to consult with counsel, and shocked and dazed by the announcement that had been made to him by said Anderson, that his wife would never return, he did agree, under his command and direction, to execute a deed conveying all of his real estate to the appellees Hubbard and Matthews in trust for his said wife; that his said wife was not present when he signed the said deed; that it was understood that said note and deed should remain in escrow until the next day, when the appellant could further examine the same, and, if not all right, that the proper corrections might be made; that at the same time the said Anderson caused the appellant to execute a bill of sale of all of his household property to his said wife, which was made without consideration, and was not delivered, but with said

deed and note was left with said Anderson as an escrow, for future examination and ratification by the appellant; that afterwards said Anderson obtained the signature of the appellant's said wife to said deed, and thereafter, without her consent, or his, or that of the appellees Matthews and Hubbard, caused the said deed to be recorded.

The action was put at issue by an answer in denial and submitted to the court for trial, and during the trial the court, in its discretion, permitted the appellees to file a second paragraph of answer, to which the appellant replied in general denial, and the trial proceeded. At the conclusion of the evidence, the court made its finding for the appellees, after which the appellant filed his motion for a new trial, which was overruled by the court and the proper exceptions reserved, and the court rendered judgment for the appellees.

There is but one error assigned, and that is, that the court erred in overruling the motion for a new trial.

After looking into the evidence, as we find it in the record, we summarize the facts, except short quotations, which we copy from the testimony of one or two witnesses:

The appellant and his wife, Susan M. Stokes, who appears as one of the appellees, are now, and had been for twenty-four years immediately preceding March 5th, 1885, husband and wife, and on that day, to all outward appearances, were living together contentedly in the city of South Bend, State of Indiana. At that time Mrs. Stokes had an uncle, a prominent lawyer, residing in said city, Andrew Anderson by name, and who is one of the appellees to this action. Mrs. Stokes also had at the same time an aunt, Mrs. Mary Harris by name, residing in said city, and who had at one time occupied the relation of step-mother to her, her father having died theretofore. Mr. Anderson and Mrs. Harris were brother and sister. On the 4th day of March, 1885, Anderson and Mrs. Harris met at her residence and held a conference as to the domestic affairs of Mrs. Stokes and her husband, and to consider of her welfare; all of which was

voluntary on their part and unknown to Mrs. Stokes. As the result of the conference, the conclusion was reached to hold an interview with Mrs. Stokes and then determine as to the future. It was agreed that Mrs. Harris should visit Mrs. Stokes at her home on that afternoon and invite her to her (Mrs. Harris') house for dinner the next day ; that Anderson should be sent for and Mrs. Stokes' domestic affairs considered further. Pursuant to the arrangement, Mrs. Harris called and spent the afternoon with Mrs. Stokes, and invited her to dine with her (Mrs. Harris) on the next day. At the breakfast table the next morning all was pleasant between Mrs. Stokes and her husband, and she mentioned the invitation she had received from her aunt and asked her husband if she should accept it ; he insisted on her doing so, and left home with that understanding, she informing him that she would return by five or half-past that evening, and when she left home intended to do so. Not only had there been no misunderstanding between them that morning, but on the witness-stand Mrs. Stokes was unable to state when there had been a disturbance, and stated that they had not quarrelled in five years ; that they never quarrelled.

Mrs. Stokes had hardly arrived at the residence of Mrs. Harris until Mr. Anderson was sent for, and soon after dinner he came. Soon after his arrival he made his mission known to Mrs. Stokes, and began to tell her of her many grievances because of the misconduct of her husband. He talked of the kind of life her husband was leading, and filled her mind and heart full of stories of his unfaithfulness. Reports of escapades of her husband with one Mary Reed, to New York, Niagara Falls and elsewhere, were graphically pictured, and although the many shortcomings of her husband, as related to Mrs. Stokes on that occasion, were communicated as well ascertained facts, it turned out upon the trial that all the information that Mr. Anderson had or possessed came to him as rumors floating around in the air.

As the result of the interview, the now discontented and

unhappy wife made up her mind not to return to her home and' to the bosom of her husband with whom she had lived for twenty-four years, but to at once apply for a divorce, and then and there employed Mr. Anderson as her attorney, giving to him full authority in the premises. From that time, although the appellant made several efforts, he was unable to obtain an interview with his wife, that he might disabuse her mind of the accusations made against him. On the morning of the 6th of March, Mr. Hubbard spoke to Mr. Anderson, at the instance of the appellant, upon that subject, but the request was in most positive terms denied.

Before the 5th of March, and before Mr. Anderson had had any conversation with Mrs. Stokes, but most likely after he had seen Mrs. Harris, and after they had agreed to interview Mrs. Stokes, he spoke to Mr. Hubbard and suggested to him that trouble was brewing between Stokes and his wife, and, in case of a culmination, that he desired his services in her behalf. Immediately after the close of the conference with Mrs. Stokes, Anderson at once repaired to the residence of the unsuspecting appellant and found him at home, and ex-- pecting to meet his wife at the appointed time. Anderson had hardly entered the threshold until the appellant was informed that his wife was now advised of his unfaithfulness, and that he (Anderson) had known of appellant's operations for some time, and that Mrs. Stokes would insist on a divorce, and would expect that suitable provision be made by him for her support, and a repayment of the money which he had used belonging to her.

The appellant, dazed and astonished, stated that all this. would bring upon him financial ruin, in answer to which he was informed that his credit was all gone anyhow. Anderson further stated that the appellant had been mortgaging his wife's property and that he had got to secure her, and probably by a conveyance of property, and insisted that they at once go to his office, which they did. In the meantime Hubbard was notified to be there in *five minutes,* and arrived.

within that time.   After a two hours' consultation at An-
derson's office, Anderson and Hubbard, two prominent law-
yers, acting on behalf of Mrs. Stokes, and the appellant
alone in his own behalf, it was finally agreed that the appel-
lant should execute his note to Anderson, for the benefit of
his wife, for the sum of $9,000, $5,000 of which she would
be entitled to as alimony upon obtaining a divorce, and the
other $4,000 representing different sums of money belong-
ing to her and used in his business, amounting to $2,000,
and for which there was no legal liability, so far as the facts
disclosed by the evidence indicate, and sixteen years' interest
thereon, less a fraction, amounting to $2,000 more, the said
note to be secured by a trust deed to Hubbard and Matthews;
and the said trust deed was to secure the further sum of
$2,700 for which Mrs. Stokes' separate real estate had been
mortgaged to secure a debt of her husband.   It was further
agreed that a bill of sale should be executed by the appellant
to his wife for certain of his household property.   In return,
Hubbard and Matthews were to execute a declaration of trust
to the appellant, whereby, upon the payment of said sums
of money by him, the said real estate should be recon-
veyed to him, or in case of its sale, after the payment of
the encumbrances upon it, and the encumbrances upon his
wife's real estate and the $9,000 note, he was to have the
surplus, and Anderson was to have Mrs. Stokes execute to
the appellant a release of all liability for her support.   With
this understanding the parties separated until the next even-
ing at half-past seven o'clock.   At this interview, Ander-
son accused the appellant of adultery with Mrs. Reed; with
having been off to Niagara Falls and elsewhere with her;
with using too much intoxicating liquors, and spoke of an
extravagant champagne bill; he further stated that Mrs.
Stokes had been neglected and that she proposed to have a
divorce.

The appellant showed no inclination to resist what Ander-
son said as to Mrs. Stokes' intention.   In this conversation it

was stated that appellant ought to pay the expenses of the divorce proceedings by Mrs. Stokes, including Mr. Hubbard's fee as her attorney, which would be $50. Appellant stated that he and Hubbard could arrange that outside, to which Hubbard acceded.

Hubbard, in his testimony, states that Anderson stated, and repeated it on that occasion, that Hubbard had been retained and was acting as the attorney of Mrs. Stokes, but at the same time states that the appellant may not have so understood it, from the fact that soon after the parties came together on the evening of the 6th, he called him out and wanted him to advise with him as his attorney.

The appellant states that he supposed Hubbard was acting for him, and is to some extent corroborated by the circumstance that he had no attorney present on the evening of the 6th, and the further circumstance that he went to Hubbard on the morning of the 6th to get him to intercede with Anderson for an interview with Mrs. Stokes.

At the same time it is not to be forgotten in this connection, that Anderson states that in the interview with Stokes on the 5th, at his house, he told him that he had retained Hubbard for Mrs. Stokes.

After the parties came together on the evening of the 6th, Anderson made known to the appellant that the rate of interest which his note was to bear for the first two years must be changed from three to four per cent., as had been before agreed upon, and that Mrs. Stokes was not satisfied with the amount of household property she was to get, but that she must have it all except some articles that had belonged to the appellant's mother, and some pictures he had brought from California.

Finally, after the papers which Anderson desired executed by the appellant had been put in proper form, and containing the conditions and terms he demanded, he requested the appellant to execute them, but the appellant hesitated, and read and re-read them; he made some suggestions as to

the declaration of the trust, and some changes were made ; he several times asked for time until the next day to consider of the matter, but Anderson was urgent.

We quote a portion of the testimony, as given by Hubbard, as to what took place on that occasion : " It got to be past ten o'clock, and Mr. Stokes would read over and over the papers, and he suggested this difficulty and that, and additions were made to the declaration of trust; of course nothing was added to the deed after Anderson got in the description of the Elkhart county property, which he got of Mr. Stokes. We made repeated additions to the declaration of trust; that was the main thing ; still Mr. Stokes hesitated ; he read it over and over, and he says to me : ' Don't you think I ought to take more time than this ? ' I said, ' I see no reason, Mr. Stokes; if you understand it you may as well close it up.' Anderson was busy with somebody else while he and I did stay for an hour or so in Anderson's room. We went in there because it was more private. He came in—it must have been after ten when he came in ; Stokes was still hesitating, although the papers were finished; he was suggesting this and that; after it was closed up and there was nothing more, Anderson says : ' Are you ready,' or ' Is it done,' or something of that kind. ' Well,' Mr. Stokes said, ' I do not know as I understand.' Well, Mr. Anderson took up the thing and read that, and said : ' You understend that, don't you ? that is a promissory note for $9,000,' and read it over. ' Yes, sir,' Stokes said. He read over the deed, and said : ' Now, you understand that, don't you ? ' Stokes said : ' Yes, sir.' He read over the declaration of trust. ' Now,' he says, ' you are a business man ; you understand this; you understand the effect of it, don't you ? ' ' Yes, sir.' Well, Stokes still hesitated. He stood there with a pen in his hand, and kept hesitating, and it got late, and Anderson said : ' This thing must be closed up to-night.' Stokes said : ' I guess I had better take more time to look it over.' Anderson said : ' No, you understand it; if you put it off you will be no

nearer to-morrow than you are to-day.' By and by he got a little impatient, and said : ' This thing must be closed up to-night ; come, close it up, Stokes ; if you understand it, go on and sign it.' Stokes kept on hesitating, and Anderson got more impatient, and showed his impatience in his manner of speaking. He said : ' Now, if you don't close it up to-night I will sue you before to-morrow morning ; this thing has got to come to an end, else I will sue by seven o'clock.' That statement was made more than once in that language. Stokes still hesitated, and we had considerable conversation. By and by he took the pen very reluctantly and went to work and signed all the papers, and they were passed over, of course. That sort of talk was of a half-hour's duration."

The witness further states that when Anderson spoke of suing the appellant he spoke in a threatening manner. The appellant spoke about wanting more time to look the papers over, and Anderson told him he could come in the next day and look them over as often as he wanted to, and if there was anything wrong it should be corrected. Anderson says that this statement only applied to the declaration of trust.

Hubbard further testified. We quote from his testimony : " The deed, when we got through with it, and its execution was acknowledged, laid there on the table in Matthews' room before us, and I think Wiley took it in the other room. My impression was that he took it in there to put a seal upon it, or something, and Wiley came up and had something to do with it. The papers all lay there ; that deed had to be recorded in both counties, Elkhart and St. Joseph, and I said to Mr. Anderson, ' will you take charge of this and see to its recording ? ' "

We quote further from the testimony of this witness : " I say when we got through signing the papers they lay on the table ; it was in Matthews' room. When the papers were gathered up I spoke to Mr. Anderson to take care of the deed. I was the grantee in it, and I asked him to take charge of it and see to the recording of it. I knew that there

was some expense attending that and I wanted him to run that part of it."

Anderson testified, and we quote from his evidence: "I told him (Stokes) he knew very well whether he could trust us or not, but the matter had to be settled that evening, so he stepped up to the desk and signed the note, deed and bill of sale, and I think he signed the declaration of trust. Mr. Hubbard signed the declaration of trust also. I called in Mr. Wiley out of the other room, he being a notary public. Mr. Stokes then acknowledged the deed before him. Mr. Wiley was my clerk. I took the deed, note, bill of sale and declaration of trust, and I think put them in an envelope, handed them to Mr. Wiley and told him to put them in the vault, and so ended the interview."

Anderson further states, and he is not contradicted by any one, that Wiley did not put his certificate or seal to the deed until the morning of the 7th. Matthews was not present on the evening of the 6th. He signed the declaration of trust on the morning of the 7th, but gave no direction as to its delivery. He at no time accepted the deed of trust or authorized its acceptance, further than what is implied from agreeing in advance of the execution of the papers to accept the trust and the execution thereafter of the declaration of trust.

The appellant testified as follows as to the signing of the papers: "I picked up the pen and hesitated about signing them. Mr. Anderson said, if my memory serves me right, 'Sign them,' or 'Sign and get through with them.' I think he only said 'Sign them.' He called Mr. Wiley in and asked him something about taking the acknowledgment of the deed. I was not acquainted with Mr. Wiley, neither did I have any conversation with Mr. Wiley that evening, nor did I see him sign his name that evening. Mr. Anderson picked up off of the table the papers and handed them to Mr. Wiley. I said to Mr. Anderson, 'I will come up and look them over in the morning.'"

The value of the appellant's real estate at the outside was about $17,000. It was encumbered to the amount of $12,-000 when the trust deed was signed on March 6th. If we add $9,000, the amount of the note executed to Anderson, and $2,700, the amount of the encumbrance on Mrs. Stokes' real estate, we have $23,700. The appellant had outside debts to the amount of $2,000. This would make his total liabilities about $25,700.

There had been put into the Mishawaka property by the appellant about $15,000. This seems to have been a property of uncertain value. If we suppose this property to have been worth $15,000, the value of the entire estate belonging to the appellant was, on March 6th, 1885, $32,000; deduct therefrom $25,700, and the balance is $6,300.

This was substantially financial ruin, for no one could convert the property and pay the liabilities. We apprehend that it would have been difficult to have found a responsible person who would have taken the property and assumed the liabilities.

A clearer case of conspiracy to separate and divorce husband and wife, and to financially ruin the husband, will rarely be found than is made out by the evidence in the case under consideration. Indeed, there seems to have been no effort to cover up or conceal the purpose. But the trouble is, the complaint fails to charge a conspiracy, and no relief can be afforded on that ground.

The appellant was not threatened with great bodily harm, nor with a criminal prosecution, and therefore was not under duress such as is recognized by the law, and can obtain no relief on that ground, although we are satisfied that the pressure that he was placed under was about as effectual as though force or criminal prosecution had been threatened.

A further question for consideration is, whether or not the deed, note and bill of sale which the appellant signed were ever delivered so as to impart to them validity as executed writings. And notwithstanding there is no conspiracy charged

in the complaint, and no such duress proven as the law will recognize, yet in determining whether or not the writings in question were delivered, all the circumstances are to be considered. In *Weber* v. *Christen,* 121 Ill. 91 (2 Am. St. R. 68), the learned judge delivering the opinion says : " We think, however, that the crucial test, in all cases, is the intent with which the act or acts relied on as the equivalent or substitute for actual delivery were done. The intent, of course, is to be gathered from the conduct of the parties, particularly the grantor, and all the surrounding circumstances." We quote the last sentence again and emphasize it : *"The intent, of course, is to be gathered from the conduct of the parties, particularly the grantor, and all the surrounding circumstances."* This language comes with much force when we remember the circumstances under which the appellant signed the writings in question. We quote further from this opinion : "Act and intention are the two elements or conditions essential to a delivery. The act may, as we have just seen, be a manual transfer of the instrument, with or without words, or it may be a purely verbal act, as, where the grantee is simply directed to go and get the deed already prepared for him."

The oral negotiations between Anderson, Hubbard and the appellant culminated on the night of the 5th of March in an agreement that the appellant would execute to Hubbard and Matthews a deed of trust for all of his real estate, a bill of sale to his wife for certain of his household property, a promissory note, for his wife's benefit, to Anderson for $9,000, and in return Hubbard and Matthews were to execute a declaration of trust, and Mrs. Stokes a release to the appellant of all liability for her future support, which Anderson was to guarantee. These were to be concurrent acts. When Anderson, Hubbard and the appellant met at the appointed time and place, Mrs. Stokes was not there, nor was Matthews. No written release from Mrs. Stokes had been

executed, and Matthews had not executed the declaration of trust, and it was not pretended that anything of the kind would be done until the next day. Indeed, the appellant was expressly told that he must execute the writings which he was to execute, on that evening, and trust to promises for the writings that were to be executed to him.

It would hardly be expected that a sane man, acting of his own free will, in view of the circumstances immediately preceding, and the treatment that he had received, would execute conveyances and obligations, which sooner or later would result in his financial ruin, and accept verbal promises from those who had brought his troubles upon him that they would at a future time comply with their part of the agreement and execute the writings which were for his benefit, and to be executed contemporaneously with his, and the sequel shows that he did not. It is true he signed the deed, the note and the bill of sale, but under what circumstances? The evidence, as we have set it out, discloses. The appellant pleaded for time. Anderson insisted that he understood the writings. Stokes hesitated and asked for time. Anderson was urgent, and said to the appellant that if he put the matter off until to-morrow, he would be no nearer ready than to-day. Anderson became impatient, and Stokes still hesitated. Finally Anderson displayed his impatience, and said to the appellant that he must close the matter that night or he would sue him the next morning by 7 o'clock. Appellant still hesitated, but finally reluctantly took the pen and signed the papers. This was about 11 o'clock in the evening. Although the appellant signed the papers, the circumstances show that he did so against his will and desire, and that he did nothing more than the pressure brought to bear upon him compelled him to do. There is no evidence tending to show any intention on the appellant's part to deliver the papers, and the circumstances all rebut any such intention. He was not pressed to deliver the papers, and therefore said nothing and did nothing in that direction.

Nothing was said or done to indicate that the appellant desired that the papers pass from under his control. He signed them and left them on the table, said nothing and did nothing to indicate what should be done with them. Anderson, anxious to get control of them, picked them up, passed them to his clerk, and by him they were put into the vault. This was not a delivery. We quote from a note in 1 Sheppard's Touchstone, on page 58 : " But if a man throws a writing on a table and says nothing, and the party takes it, this does not amount to a delivery, unless it be found to have been put there with intent to be delivered to the party."

We quote from *Hughes* v. *Easten*, 4 J. J. Marshall, 572 (20 Am. Dec. 230) : " But simply proving, as in this case, that the deed was signed and attested and left on the table without a delivery to any person, and in the absence of the donee, would not be sufficient evidence of a delivery. Signing and sealing a deed, give it no effect without a delivery."

In *Chadwick* v. *Webber*, 3 Greenl. 141 (14 Am. Dec. 222), the tenants claimed under Jeremiah Webber, a son of Charles, by virtue of a deed of the lands alleged to have been given by Charles to Jeremiah. Charles and Jeremiah were partners in trade. In 1809 Charles went before a notary, in the absence of Jeremiah, and acknowledged his deed to the premises in question to Jeremiah for the expressed consideration of four thousand dollars. Jeremiah had drawn up the deed. In 1814 certain other deeds were executed by Charles in the presence of his son and of witnesses; the deeds were all in the son's handwriting, and after they had been executed they were wrapped in a piece of brown paper and deposited by the son in a trunk, where the partnership papers were kept, and to which the father alone had the key. These deeds and the deed of 1809 were found in the father's desk on his decease, and upon the wrapper was written : " Charles Webber's deed to his son, not to be opened till after his death." The court said : "A delivery of a deed may be by acts or by words or by both. It may be

delivered by the party, who made it; or by any other person, by his appointment or authority precedent, or assent subsequent. It may be made, either to the grantee, or to any other person authorized by him to receive it; or to a stranger for his use and benefit. But if a man throws a writing on a table, and the party takes it, this does not amount to a delivery, unless it be found to have been put there, with intent to be delivered to the party. Com. Dig. Fait (A 4). And, upon the same principle, if the maker of a deed avails himself of the hand of the party for whom it is made, merely to put the deed into a trunk, desk, or other place of deposit, within the control of the maker, and such purpose is indicated and made known at the time, there is no legal delivery; no act being done, or declaration made, of an intention to deliver."

We quote and emphasize a part of what is stated in the above quotation, because of its applicability to the case under consideration: *"But if a man throws a writing on a table, and the party takes it, this does not amount to a delivery, unless it be found to have been put there, with intent to be delivered to the party."* The appellant left the deed upon the table. He said nothing and did nothing to indicate that he intended to deliver it. All the circumstances show that it was contrary to his wish to execute the deed, and so with the other papers. After they had been signed, Anderson, of his own accord, stepped forward and picked them up, handed them to his clerk and told him to put them in the vault. The mere lodgment of a deed in a place to which the grantee has access is not a delivery. *Huey* v. *Huey*, 65 Mo. 689.

We quote from *Mills* v. *Gore*, 20 Pick. 28: "Jonathan D. Wheeler, one of the attesting witnesses to the execution of the deed, testifies that he saw Gore sign the deed, and that he and Luke Harrington subscribed their names as witnesses; that Gore, who was standing by the side of Mills at a desk, took up the deed after signing it, put it before Mills on the desk, and remarked, 'There is no go back from that;' that this was before Wheeler and Harrington had subscribed

their names as witnesses; that soon after subscribing his name, he (Wheeler) left the counting-room, leaving Mills and Gore writing, and the deed remaining on the desk before them. Luke Harrington, the other subscribing witness, testifies to substantially the same facts. * * This evidence, unexplained, would undoubtedly be sufficient proof of a delivery; and so would be the possession of the deed by Mills alone, if unaccounted for, be good *prima facie* evidence of a delivery. But the question in this case is not, whether the plaintiffs have produced sufficient *prima facie* or presumptive proof of a delivery, but whether the plaintiffs have proved the fact by direct testimony. There is no proof of the delivery of the deed into the hands of Mills; but a deed may be delivered to a party by words without any act of delivery; as if the writing sealed lieth on the table, and the feoffor or obligor saith to the feoffee or obligee, go and take up the writing, it is sufficient for you, or it will serve the turn, or take it as my deed, or the like words, is a sufficient delivery. Co. Lit. 36; Com. Dig. Fait, *A* 3; 4 Stark. Ev. 477. If however a party throws a writing on a table and says nothing, and the other party takes it up, this does not amount to a delivery, unless it be found to be put there with the intent to be delivered to the party, or to be taken up by him. Com. Dig. Fait, *A* 4; *Chamberlain and Staunton's Case,* 1 Leon. 140. Admitting these principles, which seem to be well established, we are of opinion that the evidence on the part of the plaintiffs is not sufficient to prove a delivery of the deed and note to them. The words used by Gore, when he placed the deed on the desk, do not indicate an intention to deliver the deed at that time; they only manifest the intention of completing the contract of sale, but not of delivering the deed before he received H. D.'s note; and there can be no reasonable presumption that he ever intended to deliver the deed before he received the note."

We quote from *Woodman* v. *Coolbroth,* 7 Greenl. 181, side page (syll.): "Where the parties to a deed were both pres-

ent at the time of its execution, and the grantor was bound
by his previous contract to make the deed, yet the grantee
having taken it up and carried it away without the consent
of the grantor, this was held to be no delivery of the deed."
See *Woodbury* v. *Fisher,* 20 Ind. 387 ; *Dearmond* v. *Dear-
mond,* 10 Ind. 191 ; *Tharp* v. *Jarrell,* 66 Ind. 52; *Jones* v.
*Loveless,* 99 Ind. 317.

Another circumstance which is not to be overlooked in
this connection is, that the appellant was to have the privi-
lege of returning to Anderson's office on the next day
after he signed the papers to examine them, and, if they
were found to be incorrect, proper corrections were to be
made.   Hubbard and the appellant state that this was a con-
dition applicable to all of the papers.   Anderson limits it to
the declaration of trust.   But whether applicable to all or to
a part, the right to an examination on the next day was re-
served, and if the papers, or paper, to be examined were, or
was, found to be incorrect, the proper corrections were to be
made.

From the evidence, as we have it before us in the record,
the papers in question were never delivered.   We do not
reach this conclusion upon the weight of the evidence, but
as a legal conclusion arising from all the evidence in the
record.

Another question presented by the record, and the last
one which we shall consider, is as to whether there was any
valid or legal consideration passing to the appellant for the
deed, promissory note and bill of sale.   Upon this question
a great deal need not be said.   As is already disclosed, the
appellant and his wife were living together as they had lived
for twenty-four years, without any thought of separation or
of legal proceedings on her part to obtain a divorce and ali-
mony.   But after an interview with her uncle and aunt Mrs.
Stokes makes up her mind that there must be a dissolution
of the marriage relation existing between herself and hus-
band, and provision made by him for her support in the

future, and the services of the uncle are engaged and the whole matter is entrusted to him.

Mr. Anderson at once informs the appellant what has been determined upon, and that in the action for divorce the charge of infidelity will be relied on. A settlement as to alimony is demanded in advance, and the amount claimed is $5,000. Afterwards the appellant is informed by Mrs. Stokes' legal advisers that the action for divorce is a foregone conclusion, and that no adjustment can be made that will avert it, but as to the costs which will accrue, and her attorney's fees, there may be some arrangement made.

Finally an adjustment is agreed upon. The appellant is to secure in advance the sum of $5,000 as alimony, pay the costs and the plaintiff's attorney's fees in the divorce case, and the amount that he shall pay to her attorney is agreed upon, and instead of bringing a charge of infidelity against the appellant he is to be charged with a failure to provide for his wife. And one of her attorneys, her principal adviser, suggests that he will talk with the judge of the court in which the divorce proceedings are to be instituted, and relate to him the circumstances, and ascertain if he can the probability of securing the divorce on the ground proposed. And it is agreed further that Mr. Hubbard is to have the management and control of the divorce proceedings, and an agreement is made with him as to the fee to be paid. This was a mere collusive agreement between husband and wife, whereby the wife was to obtain a divorce from her husband. The agreement in effect was, that Mrs. Stokes would ignore the cause of divorce which actually existed, as she claimed, and allege another, upon which she did not in fact rely; that her husband would make no resistance to the action, but would aid in bringing about the desired result by agreeing to pay the costs and the fee of her attorney.

The principal matter, under the arrangement, was the dissolution of the marriage, and incidental thereto the settle-

ment that was made, including the writings which are involved in this action.

The entire transaction was one which was against public policy, and therefore the consideration for the signing and delivering of the writings was illegal. As the writings rest upon an illegal consideration, the courts will not recognize or enforce them.

The case of *Dutton* v. *Dutton*, 30 Ind. 452, is not a parallel case to the one under consideration. In that case an action was pending by the wife against the husband for a divorce, and on the day the judgment and decree was entered of record, and immediately preceding, an agreement was made that the amount of the recovery on account of alimony should be $1,000, to be paid by the conveyance to the wife of a certain tract of land, the husband to pay the costs and the wife's attorney's fee. After the decree had been recorded, the husband, in payment of the judgment, executed the conveyance. Under the arrangement the conveyance was as complete a payment of the judgment as though it had been paid in money, and it was unimportant whether the original agreement was, or was not, illegal.

That a contract made between husband and wife, in view of separation, and fully executed by the husband, fair and equitable between the parties, will be upheld, as ruled in the foregoing case, does not conflict with the conclusion we have reached. It may be that if an action for divorce is pending, or if, in anticipation of such an action, the parties meet and agree upon the amount of alimony to be allowed to the wife in case a divorce is granted, and the arrangement is just and equitable, and confined strictly to the matter of alimony, it will be sustained. But if the agreement is broader in its terms, and its tendency is to interest the husband in procuring a divorce or in foregoing resistance to an effort by his wife to that end, then it is contrary to public policy, and is void. *Everhart* v. *Puckett*, 73 Ind. 409; *Muckenburg* v. *Holler*, 29 Ind. 139; *Viser* v. *Bertrand*, 14 Ark. 267; *Adams*

v. *Adams*, 25 Minn. 72 ; *Sayles* v. *Sayles*, 21 N. H. 312 (53 Am. Dec. 208).

We quote from the last case : " The cases cited, show with what strictness and care the law guards and upholds the marriage relations ; and that no contract, having for its object their dissolution, or calculated to disturb them, can be sustained. In this State at least, a separation *a vinculo*, can only be effected through a decree of the courts of law. No agreement of the parties can have that effect. Sound policy as well as established law forbids it, and any agreement made in fraud of the purposes of the law, and against its policy, is illegal and void." Bishop Mar. & Div., section 635 *et seq. ;* 1 Bishop Married Women, section 760 ; *Speck* v. *Dausman*, 7 Mo. App. 165.

The judgment is reversed, with costs.

MITCHELL, J., took no part in the decision of this case.

Filed May 7, 1889.