Argued April 30; affirmed July 1; argued on rehearing November 9; former opinion adhered to November 25, 1941

GIDDINGS ET AL. *v.* GIDDINGS ET AL.

(114 P. (2d) 1009, 119 P. (2d) 280)

Before Kelly, Chief Justice, and Bailey, Rossman and Lusk, Associate Justices.

*Allan G. Carson*, of Salem (Carson & Carson and T. Harold Tomlinson, all of Salem, on the brief), for appellants.

*Lester G. Oehler*, of Corvallis, and *R. M. Burley*, of Portland (Edward E. Sox, of Albany, on the brief), for respondents.

KELLY, C. J. This is a suit to impress a trust on real and personal properties pursuant to a contract to make a will and for declaratory and injunctive relief auxiliary thereto. The properties are those belonging to the estate of C. M. Giddings, deceased.

On July 9, 1920, a written contract was executed by said C. M. Giddings and Harriet Giddings, now deceased, who were then married to each other, and on July 20, 1920, said contract was modified by another written agreement executed by C. M. and Harriet Giddings. These written instruments form the basis of plaintiffs' cause of suit.

Plaintiffs and defendant, William J. Giddings, are the only children of C. M. Giddings and Harriet Giddings. Defendant, William J. Giddings, is the administrator of the estate of C. M. Giddings, deceased.

On or about the 26th day of December, 1934, said C. M. Giddings and Harriet Giddings entered into an agreement which purported to annul, render void and cancel the contract of July 9, 1920. Plaintiffs contend that this contract of December 26, 1934, is wholly void and inoperative for indefiniteness, uncertainty, want of mutuality and want of consideration.

The view we entertain of the record herein renders it necessary to discuss only the question whether the agreement of July 9, 1920, as amended on July 20, 1920, was an illegal contract. In fairness to the record, however, copies of the purported contracts are here presented.

The following is a copy of the agreement of July 9, 1920:

"This Contract, Made and entered into by and between Calvin M. Giddings, party of the first part and

Harriet Giddings, party of the second part, both parties of the State of Oregon, Witnesseth:

That Whereas, the parties hereto are husband and wife and have been for a number of years and have a family of grown sons;

And Whereas, differences and disagreements have arisen between the parties hereto until the parties cannot live together in peace and harmony;

And Whereas, they are desirous of a settlement of their financial and property rights between themselves without interferences of any court or persons other than themselves.

It is, therefore, mutually agreed by and between the parties hereto that, for and in consideration of the promises and agreements of the party of the second part hereinafter mentioned and set forth, that the party of the first part will, and he hereby agrees to pay to the party of the second part, the sum of Sixty Dollars ($60.00) per month, to be paid on or before the 10th day of each and every month commencing with the 10th day of July, 1920, and continuing so long as the party of the second part shall live and will on this date, and contemporaneous with the signing and delivering of this contract, pay to the party of the second part the sum of Twenty-Two Hundred Dollars ($2200.00) in Liberty Bonds, by delivering the same to the party of the second part, and to turn over to the party of the second part one-third of the purchase price for a tract of land belonging to the party of the first part situated near Gray Station in Linn County, Oregon, which is now being sold to W. J. Giddings for the sum of Twelve Thousand ($12,000), which said land is more particularly described in deed from G. C. Turner and wife to M. A. Blower, said deed being recorded in Books of Deeds, Vol. 103, at page 326, Records of Linn County, Oregon, and recorded on the 28th day of August, 1913, and when said sale is consummated, one-third of the purchase price thereof, whether made in cash or notes secured by a mortgage, shall be taken in the name of the party of the second

part and paid to the party of the second part, and two-thirds thereof taken in the name of the party of the first part, and two-thirds of the payments made to be made direct to the party of the first part, it being understood that one-third of the purchase price shall go to the party of the second part, and two-thirds thereof to the party of the first part.

It is further stipulated and agreed that the party of the first part will build a comfortable modern dwelling house, the same to have a suitable fireplace, on the tract of land immediately West and adjoining the property on which stands the dwelling house now occupied by the parties hereto, which dwelling house shall be according to the plans and designs made by Leander J. Giddings, Harriet Giddings, and the party of the first part hereto, and the party of the first part is to make a deed to the said lands upon which said dwelling house is to be erected, conveying the same to the party of the second part.

It is further stipulated and agreed that the party of the second part may occupy the home belonging to and now occupied by the party of the first part, and situated in Albany, Oregon, until such time as the dwelling house to be built shall be completed.

It is further stipulated and agreed that the party of the second part may remove the necessary furniture from the dwelling now occupied by the parties hereto to the new dwelling house as soon as the same shall be completed for the purpose of furnishing the same for occupancy, and the party of the first part is to furnish to the party of the second part a good new electric sweeper.

It is further stipulated and agreed that in the event the party of the first part should die before the party of the second part that one-third of the lands, money and property that the party of the first part may own and possess at his death shall go to the party of the second part to be hers and used by her, and she to have the rents, issues and profits thereof during her natural life, but the principal and original property, if

any, shall go to the children of the party of the first part and the party of the second part, they being the children of the two.

It is further stipulated and agreed that the party of the second part, for and in consideration of the promises and agreements hereinabove made, to be kept by the party of the first part and by him performed, hereby agrees and does hereby waive all interest, right and title, whether in equity or in law, in and to all of the property that may belong to the party of the first part either now or that he may hereafter obtain, and that in the event of the death of the first party before the party of the second part, that she, the said second party, will not claim any interest, right or equity, in the estate of the party of the first part.

It is further stipulated and agreed that in the event a divorce is obtained by either of the parties hereto, or in the event a suit shall be brought for that purpose, the other party hereto will not claim any alimony, suit money, or any money for the support of the other or the support of the children, nor will either claim any interest in the property of the other, nor will either of the parties, or the party bringing said suit, and the party obtaining said divorce, if one shall be granted, will not receive or accept any judgment or decree for either suit money, alimony or maintenance, but the party bringing said suit shall pay the expenses and costs of said proceedings, whether a divorce is obtained or not.

It is further stipulated and agreed that all of the children of the parties hereto are of the age of majority or of sufficient age to take care of and maintain themselves, and that it becomes unnecessary to have any contract or judgment or decree for their maintenance, care or protection.

It is further stipulated and agreed that the parties hereto will not, in any manner, interfere with the personal or business affairs of the other or make any effort to injure the other in any way, shape or form, or manner.

In Witness Whereof, we hereunto set our hands and seals in duplicate this the 9th day of July, 1920.

Done in presence of: Calvin M Giddings Seal
 Party of the First Part.

Robert K. Burton
Elizabeth B. Burton Harriet Giddings (Seal)
Wm. J. Giddings'' Party of the Second Part

The modification of the foregoing agreement, made on July 20, 1920, provided that the second paragraph thereof providing for ''a comfortable modern dwelling house'' should be amended and modified so as to read as follows:

''It is further stipulated and agreed that the party of the first part will purchase the materials, let contracts or hire laborers and generally manage the construction of a dwelling house on a tract of land which the party of the first part has deeded to the party of the second part, which tract of land is situated on the North side of Sixth Street between Baker and Montgomery Streets in the City of Albany, Oregon. It is understood and agreed that said dwelling house shall be constructed upon plans furnished by the party of the second part. The party of the first part agrees to pay the sum of $1500.00 toward the construction of said dwelling house and if the cost of the construction of said dwelling house, which cost is to include the total expense for all labor and materials, exceeds $1500.00 the party of the second part is to pay the excess above $1500.00. If the total cost of the construction of said dwelling house is less than $1500.00 then and in that event the party of the first part agrees to pay to the party of the second part in cash the difference between the total cost of construction of said dwelling and said sum of $1500.00. It is agreed that the party of the first part shall make no charge to the party of the second part for his services in managing the construction of said dwelling house and that his services are not to be included in the cost of the construction of the same as hereinbefore specified.''

The contract dated December 26, 1934, is as follows:

"This agreement entered into by and between Mrs. H. Giddings of Albany, Oregon and C. M. Giddings of Corvallis, Oregon, agrees that certain contracts dated July 9, 1920 shall be considered null and void and cancelled and that C. M. Giddings agrees to pay to Mrs. H. Giddings sixty dollars per month and that at his death the Administrator is to pay to her the interest from the Jenks loan during her life and that if the interest does not amount to sixty dollars per month he shall pay her enough from the principal to make it sixty dollars per month.

At the death of Mrs. H. Giddings the balance remaining from the Jenks loan is to be divided between the legal heirs of C. M. Giddings.

H. Giddings
C. M. Giddings.

Signed and sealed this 26th day of December, 1934 in the presence of:
Luther Giddings
Paul C. Giddings."

We are of the opinion that the original contract of July 9, 1920, being the one upon which plaintiffs' cause of suit rests, was and is unenforcible because of illegality.

Eighteen days after that contract was signed, namely, on July 27, 1920, a divorce was granted to C. M. Giddings by the circuit court of Multnomah county.

■ Bearing in mind that at the time the parties were residents of Linn county; that the contract deals plainly with the question of alimony and costs of obtaining a divorce and waiver of rights otherwise attendant upon divorce; and, taking into consideration the testimony introduced by plaintiffs, as to the procurement of that contract, we can come to no other conclusion than that it was an unenforcible contract.

The plaintiff, Leander J. Giddings, testified as follows:

"Q. Did he [referring to C. M. Giddings] have anything to say to you with reference to seeing your mother about obtaining a divorce?

A. He did.

Q. What was that?

A. Why, he came to me while I was operating a sawmill out near St. Paul.

Q. Oregon?

A. Yes, St. Paul, Oregon, and asked me to intercede with mother, who always opposed a divorce. She had religious rules against it. To intercede with mother in an attempt to have her agree to allow him to get a divorce.

Mr. Oehler: If the Court pleases, this is all this line of testimony to which we have our objection.

The Court: Yes, you have objected to it. I understand.

Mr. Carson: What else if anything did he say about it to the best of your memory?

A. Well, he put it up to me pretty strong. I told him that I thought it would take a good deal of talking to get mother to agree to a divorce. He admitted that he couldn't get one unless she allowed it to go on, and he said that he was in a tight place and had to have it.

Q. Did he elaborate any on what he meant by tight place?

A. No, I think not.

Q. Did you talk with your mother about that?

A. Yes.

Q. And what transpired on that occasion?

A. Well, I just simply put it up to mother, that if dad was in a tight place where he had to have a divorce to save him that neither she nor I were interested in seeing any harm come to him and that it would be best for her to let it go on.

Q. What did she say about that?

A. Well, she finally assented."

The plaintiff, Paul C. Giddings, testified as follows:

"Q. Did your father ever talk to you, or did you ever overhear him say anything about this proposed divorce between him and your mother?

A. I was in a very similar position to Lee perhaps in that regard, inasmuch as I had been living at home most of the time. He came to me and wanted me to try and talk mother into having a divorce.

Q. Did he say why?

A. He said he had to have it. That he was in a tight spot or in a fix, or something of the sort.

\* \* \* \*

Q. Did you speak to your mother about the matter?

A. No, sir.

Mr. Oehler: 'About the matter'. About getting the divorce?

Mr. Carson: Yes, Well, I mean about getting the divorce.

A. Oh, yes I did.

Q. What did you say to her to the best of your memory?

A. Well, I said it looked like when a person wanted a divorce as bad as he did about the only thing was to give it to him.''

 Plaintiff, Luther Giddings, was in Utah when the contract of July 9, 1920, was executed. Over the objection of defendants' counsel and the ruling of the court, plaintiffs' counsel took the following testimony ''under the rule'', in answer to a question whether he had heard anything from the parties relative to the background of that, referring to the divorce between Harriet Giddings and C. M. Giddings:

''A. Mother wrote to me prior to the divorce that father was urging it, and she was apparently very much worried over it.'' [End of quotation from testimony.]

''The welfare of society is so deeply interested in the preservation. of the marriage relation, and so

fraught with evil is regarded whatever is calculated to impair its usefulness, or designed to terminate it, that it has long been the settled policy of the law to guard and maintain it with a watchful vigilance. Although marriage, in the eye of the law, is a civil contract, unlike any other contract, it cannot be rescinded or annulled by consent of the parties to it. By mutual consent, if the parties are of the proper age and capacity, the marriage relation may be created and receive the sanction of the law, but it cannot dissolve or terminate it. That high office can only be performed by a court of competent jurisdiction, for some specified cause prescribed by law, upon proof taken in a suit for that purpose. The good order and well being of society, as well as the laws of this state, require this. And so strict and careful are courts in the administration of this justice, out of regard for the public morals and the general welfare of society, that they will esteem it their duty to interfere upon their own motion whenever it appears the dissolution is sought to be effected by the connivance or collusion of the parties; and all contrivances or agreements, having for their object the termination of the marriage contract, or designed to facilitate or procure it, will be declared illegal and void against public policy.'' *Phillips v. Thorp*, 10 Or. 494.

■ See also *Hodler v. Hodler*, 95 Or. 180, 185 P. 241, 187 P. 604, 109 A. L. R. 846.

In dealing with illegal contracts,—''If the illegality appears from the complaint or the plaintiff's case, the court will, at any stage of the proceedings, dismiss the action, although such illegality is not pleaded as a defense, or insisted upon by the parties, and may have been expressly waived by them. It is an objection which the court itself is bound to raise in the due administration of justice, regardless of the wishes of the parties: Oscanyan v. Arms Co. 103 U. S. 261 (26 L. Ed. 539); Buchtel v. Evans, 21 Or. 309 (28 Pac. 67); Ah Doon v. Smith, 25 Or. 89 (34 Pac. 1093); Bradfelt

v. Cooke, 27 Or. 194 (40 Pac. 1, 50 Am. St. Rep. 701);
Miller v. Hirschberg, 27 Or. 522 (40 Pac. 506); Pacific
Livestock Co. v. Gentry, 38 Or. 275 (61 Pac. 422, 65
Pac. 597; Cullison v. Downing, 42 Or. 377 (71 Pac. 70);
Kreamer v. Earl, 91 Cal. 112 (27 Pac. 735)." *Jackson
v. Baker*, 48 Or. 155, 85 P. 512.

See also *Mitchell v. Coach*, 83 Or. 45, 153 P. 478,
162 P. 1058; *Rosenkrantz v. Barde*, 107 Or. 338, 214 P.
893; *Newport Construction Co. v. Porter*, 118 Or. 127,
246 P. 211; *Vnuk v. Patterson*, 118 Or. 602, 247 P. 766,
47 A. L. R. 394.

■ Clearly the illegality of the contract of July 9,
1920, appears from plaintiffs' case. For that reason,
the order of the circuit court dismissing this suit is
affirmed; and it is ordered that neither party recover
costs or disbursements herein.

Argued on rehearing November 9; former opinion adhered to
November 25, 1941

ON REHEARING
(119 P. (2d) 280)

Before KELLY, Chief Justice, and BELT, BAILEY,
LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

KELLY, C. J. A rehearing of this case afforded
an opportunity to hear the question argued whether
the agreement is collusive upon which plaintiffs seek
to recover. In and of itself alone it is not. There is no
stipulation or agreement expressly stated in it that
Calvin M. Giddings, party of the first part therein,
may secure a divorce from Harriet Giddings, party
of the second part therein, and that such party of the
second part will not oppose the procurement of such
a divorce. Neither does it appear in that written agree-

ment that Calvin M. Giddings could not procure a divorce if Harriet Giddings should contest his suit therefor.

To the writer, those facts, although omitted from the written document, are indisputably shown by plaintiffs' testimony and by the testimony elicited by plaintiffs on cross-examination of defendant, Minnie A. Giddings, over the objection of defendants.

■ There is no presumption that a contract for the settlement of property rights, made in contemplation of a possible divorce, is necessarily collusive; but in each particular case the court should look to all the facts and circumstances to determine whether the contract has that effect. Annotation, Subject, Collusion as Bar to Divorce, 109 A. L. R. 832, 844, and authorities there cited.

It is with regret that it becomes necessary to outline the facts and circumstances of this case, bearing on the collusive nature of the transaction involved herein, for the reason that an innocent minor is one of the interested parties.

As the writer understands the record, those facts are as follows:

When Minnie A. Giddings was a mere child, her father gave her to Calvin M. Giddings to educate and care for as his own daughter. That his interest in her developed a lover's infatuation is shown by the following facts: Sometime about 1916, 1917 or 1918, while Minnie and her sister were operating a rooming house in Portland owned by him and while his home was in Albany, he had a room reserved for his use and occupancy in the Portland rooming house; and spent most of the time at that rooming house while Minnie was there. In 1918 or 1919, while Minnie was engaged

in picking oranges at Riverside, California, Calvin M. Giddings went there and remained for approximately six months. During the year 1918, he paid Minnie's room rent while she was at a rooming house where he was also stopping. While Minnie and he were in California, he talked marriage to Minnie and told her that he had left his wife and was getting a divorce or had procured one.

They were together some months in San Antonio, Texas, also in Canada, and probably at Vancouver, Washington.

The record discloses that while during those times, Calvin M. Giddings' first wife Harriet Giddings was an invalid, she gave no cause for divorce. On the other hand, she was a cultured, Christian woman commanding the respect of those who knew her.

Two of the plaintiffs testify that their father, Calvin M. Giddings, came to them and implored them to intercede with their mother to gain her consent to a divorce. He then stated that he could not get a divorce unless she agreed to it. These two sons, who are plaintiffs herein, told their father in effect that it would be difficult to induce their mother to give her consent. The record is plain and undisputed that Calvin M. Giddings said he was in a "tight spot" and he would have to have a divorce. That was one reason upon which these two plaintiffs based their plea to their mother. After both of these plaintiffs asked their mother to consent to a divorce, the mother finally consented. Before that consent had been obtained by her sons, it cannot be maintained that the written agreement upon which plaintiffs seek to recover could have been procured. The foregoing is a thumb-nail sketch of the events leading up to the execution on

July 9, 1920, by Harriet Giddings and Calvin M. Giddings of the agreement in suit. In a minor particular, that agreement was modified on July 20, 1920. Seven days thereafter on July 27, 1920, the defendant therein, Harriet Giddings, not appearing, but being in default, a decree of divorce was rendered without any reference therein to the original agreement on July 9, 1920, or its subsequent modification.

The sons said that their father did not explain the nature of the dilemma which he characterized as a "tight spot". To the writer, no explanation was necessary. "Actions speak louder than words."

Thus we have a conscientious, Christian wife, induced by two of the plaintiffs to make a collusive agreement to relieve her husband, their father, of the result of his flagrant misconduct; and the agreement in suit is one of a series of steps taken by Calvin M. Giddings to that end. That writing, but partly evidences the actual transaction which, to be understood in its entirety, requires a consideration of the foregoing facts.

"The form of the contract is immaterial. The law will not countenance any device, no matter how devious, calculated to dissolve the marriage. And so a contract which tends to open the door to a collusive divorce is void even though there may be no express promise by a spouse not to resist suit. Even though legal grounds for divorce may exist, a promise not to interpose a defense in divorce proceedings will invalidate the entire agreement. So, too, will a promise to abandon a defense in a pending divorce suit. Where the corrupt understanding as to divorce is part of a property settlement, the settlement will be held void.

"A promissory note executed in consideration of a promise to facilitate divorce is unenforcible; * * * The rule as to unenforcibility applies not only to a note but to all collateral writings that are made in

pursuance of the collusive divorce scheme." Lindey, Separation Agreements Ante-Nuptial Contracts and Marriage Settlements, pp. 381, 383, Section 23, citing in note 17 to the point of the invalidity of a property settlement: *Beard v. Beard*, 65 Cal. 354, 4 P. 229; *Appeal of Seeley*, 56 Conn. 202, 14 Atl. 291; *Ehlers v. Ehlers*, 259 Ill. App. 142; *Fredricks v. Sault*, 19 Ind. App. 604, 49 N. E. 909; *Taylor v. Ashe*, 284 Mass. 182, 187 N. E. 548; *Gurley v. Gorman*, 137 Miss. 210, 102 So. 65; *Palmer v. Palmer*, 26 Utah 31, 72 P. 3, 61 L. R. A. 641, 99 Am. St. Rep. 820; and also citing in note 20, *Stokes v. Anderson*, 118 Ind. 533, 21 N. E. 331, 4 L. R. A. 313.

Plaintiffs' counsel argued on rehearing that the record was silent with respect to what would have prevented Calvin M. Giddings from procuring a divorce from his wife Harriet. The writer does not concur in that view; but mentions it in order to disclose that close attention was given to counsel's argument which was to the effect that the obstacle to such a divorce may have been merely a course of conduct which the wife could have waived; and hence, her consent to the divorce is not shown to be collusive. In this, counsel fails to distinguish between on the one hand, the making of an agreement consenting to a divorce and thereby facilitating it; and on the other hand, merely not choosing to make, and not making any defense.

"No harm will come to the plaintiff or the public simply from the defendant's not choosing to make and not making a defense. But a bargaining that there shall be none is not permissible. And no promise founded on such an undertaking can be enforced." Vol. 2, Bishop on Marriage, Divorce and Separation 288, sec. 700, note 2, citing Kilborn v. Field, 78 Pa. 194; Stoutenburg v. Lybrand, 13 Ohio St. 228; Belden v. Munder, 5 Minn. 211, 80 Am. Dec. 407; Viser v. Bertrand, 14 Ark. 267.

"An agreement not to defend or to withhold evidence detrimental to complainant's case is collusion." 27 C. J. S. Subject: Divorce, 622, § 65.

This suit was instituted to impress a trust pursuant to the provisions in the contract of July 9, 1920, to the effect that at the death of the contracting parties the "principal and original property, if any, shall go to the children of the party of the first part and the party of the second part, they being the children of the two."

It cannot be said that this provision was not in part, at least, supported by the agreement by the wife consenting to a divorce by the husband. In other words, it seems to the writer that as a part consideration for being permitted to procure a divorce the husband agreed to restrict the final disposition of the property mentioned to the children of his first wife and himself to the exclusion of a child or children, if any, yet to be born to him and his second wife. It is this effect upon a child of the second marriage which the present suit seeks to enforce. For this reason, in the opinion of the writer, such cases as *Edleson v. Edleson*, 179 Ky. 300, 200 S. W. 625, 2 A. L. R. 689, are not in point.

The writer is impressed with the following excerpt from an early opinion of the North Carolina Equity Court:

"The relation of husband and wife is at the foundation of society. It is natural, as well as conventional. It was the relation of the first pair of our race, and has existed ever since. It is universal in civilization, and not uncommon in barbarism. It is indispensable to that other important relation of parents and children. Incident to it are its inseparable and indissoluble

characteristics,—its oneness,—'they shall be no longer twain but one flesh,' 'to live together after God's holy ordinance,' 'so long as they both shall live.' But little legislation is necessary to define and regulate it. We know it by intuition. It is induced by the strongest passion of the human soul,—love. It is the most endeared relation which nature makes or society forms. When lusts entice, or wealth prompts the relation, it may prove a curse where one is satiated and the other wasted; but when love, virtuous and disinterested, ardent and mutual, prompts the relation, it is incomparable. Such is the relation as it exists with us. It is formed in perfect freedom. There are no constraints of parents, of custom, or of laws; nor any influences but such as are conducive to its happiness. It is formed in perfect simplicity, and preserved in religious purity. The husband is the stronger, and rules as of right; the wife is the weaker, and submits in gentleness. The frailties of each are excused or forgiven; their sentiments are in unison; their manners in conformity; their interests the same; their joys and sorrows mutual; their children are a common bond and a common care; and they live, not separately, but together,—the nursery of morality and piety, and the bulwarks of society.

How different from this is marriage, quarrel, separation,—the anomalous condition of a husband without a wife, a wife without a husband, parents without children, and children without parents. Such relations too surely follow deeds of separation. Let it be understood that marriage is only an experiment, to be formed inconsiderately, and broken capriciously; to be put on and off like a garment; that husband and wife may have separate establishments, in which to nurse their hate and cover their irregularities; that children may be trained to hate one parent or both, and to have the care of neither; and society to have constantly in view the nuisance of their infidelities;—and what greater evil can be imagined?" *Collins v. Collins*, 62 N. C. 153, 1 Phillips, North Carolina Equity Report, 153, 93 Am. Dec. 606.

Not waiting until six months had elapsed after the decree of divorce had been rendered, but exactly two months thereafter, Calvin M. Giddings went through a ceremony of marriage with his ward whom he was to educate and care for as a daughter. This ceremony took place in California. Ever since that ceremony until Calvin M. Giddings died, he and Minnie lived together as husband and wife.

On October 13, 1927, more than seven years after the marital ceremony above mentioned, Calvin M. Giddings and Minnie were married. On April 12, 1928, a daughter was born to them.

The facts being as above stated, the writer is unable to come to any other conclusion than that the instrument in suit was collusive, not by its terms, but by the circumstances attendant upon its execution and the agreement of which it was only a part actually made between the parties which, as stated, was partly oral and partly written.

In the case of *Gurley v. Gorman*, supra, the widow, Mrs. Pearl Gorman, sought to renounce the will of her deceased husband John Gorman, and to take her legal share of the estate. The heirs at law contested her right to renounce the will on the ground that the deceased, while living, had fully settled with his wife for her share in the estate. Mrs. Gorman had signed a release to all of her interest in the estate for the consideration of $330 before the death of her husband.

We quote from the opinion:

"This settlement, as evidenced by the written release appears from the record to have come about in this way: James Gorman and his wife had not been living in harmony, and they went together to the office of a lawyer and there discussed the differences between themselves and a settlement thereof. At this

conference, which was attended only by Mr. Gorman, his wife, and a lawyer, it was agreed that Mr. Gorman should pay his wife $330 in settlement of any claim that she might have against his estate, and that Mrs. Gorman would file a bill for divorce, and Mr. Gorman agreed that he would not contest the divorce suit. After the money was paid over to her and the written release signed by her, the lawyer proceeded to prepare and file the bill for divorce, and the parties then left the office. Afterwards, it seems the bill was dismissed and a new suit for alimony instituted by the wife, whereupon Mr. Gorman answered with a cross-bill, seeking a divorce from her and pleading his release for the sum of $330. No divorce was granted.

We think the subsequent events regarding the separation and divorce proceedings between Mr. and Mrs. Gorman are immaterial for the purpose of deciding the question presented to us on this appeal, and therefore we shall not state these proceedings or the outcome thereof.

After hearing all the testimony, the chancellor decided that the release was invalid, for the reason that the settlement and release was the result of a collusive agreement between the husband and wife for the purpose of promoting or facilitating the procurement of a divorce, which collusion was contrary to public policy and vitiated the settlement. * * *

We have considered the evidence in the record showing that the settlement and release was induced by, and was a part of, the collusive agreement to secure the divorce, and we think it was sufficient to support the finding of fact by the chancellor that the settlement was the direct result of the collusion between the parties.

The rule seems to be well established in all other jurisdictions, and we approve and adopt it, that collusion between husband and wife to obtain a divorce is illegal and contrary to public policy, and that any contract or agreement made by virtue of or in connection with such collusive agreement is unenforceable in the courts, and cannot be set up as a binding con-

tract." In the case of *Gurley v. Gorman,* supra, 9 R. C. L. pt. 13, p. 254, and *Palmer v. Palmer,* supra, are cited.

Reference to the citation to R. C. L., just mentioned, discloses a citation to the case of *Blank v. Nohl,* 112 Mo. 159, 20 S. W. 477, 479, 18 L. R. A. 350.

We quote from the opinion in *Blank v. Nohl,* supra:

"Back of the question whether the contract can be valued so as to allow the plaintiff a sum in gross in full discharge of it, is the more important one, whether the agreement can be enforced at all, so far as it remains unexecuted. In other words, the question is whether the agreement violates a sound public policy. Marriage is more than a mere civil contract. It is a matter of state concern; and, when the marital relation is once created, it cannot be dissolved by any agreement of the parties. It can be dissolved, and dissolved only, in the manner and for the causes allowed by law. Courts sitting in divorce cases are bound to protect the public interests as well as the rights of the parties themselves; and hence it is that, before a party is entitled to a divorce, it must be made to appear by proof that he or she is the innocent and injured party; and this, too, though there is a default on the part of the other party. For like reasons, the law is well settled that an agreement having for its object and consideration the granting of a divorce is illegal and void. Says Bishop: 'But the law does not favor divorce and permits it only in approved cases, and on sentence from duly-established authority. Therefore any agreement for divorce, or any collateral bargain promotive of it, is unlawful and void.' 2 Bish. Mar. & Div. § 696, (Ed. 1881.) The defendant in a divorce suit is not bound to make a defense, and mutual assistance in proving the actual facts does not amount to collusion. Stew. Mar. & Div. §§ 302, 303. But a bargain that there shall be no defense is collusion, and any promise founded on such an undertaking cannot be enforced. 2 Bish. Mar. & Div. § 239, (6th Ed.) The case of Barnes

v. Barnes, 1 L. R. Prob. & Div. 505, furnishes an illustration of what are and what are not collusive contracts. It is there said, in substance, that the mere fact that the husband gave the wife money for her support, both before and after he instituted the divorce suit, did not prove collusion; but furnishing the support in consideration that the wife would keep quiet, so that he could get a decree cheaper than he otherwise would get it, was collusion. Says Bishop: 'It makes no difference how just the cause may be, if the parties collude in the management of the case before the court, this is collusion. It is also collusion where material facts are suppressed, though they would not have changed the result.' 2 Bish. Mar. & Div. § 28, (6th Ed.). The authorities are numerous to the effect that any agreement that the defendant in a divorce suit will not make a defense, or having for its object the dissolution of a marriage contract, or designed to promote and facilitate a divorce, is void, because opposed to the policy of the law; and any promise founded on such an agreement is also void, and should not be enforced. Sayles v. Sayles, 21 N. H. 319; Cross v. Cross, 58 N. H. 373; Viser v. Bertrand, 14 Ark. 267; Stoutenburg v. Lybrand, 13 Ohio St. 228; Kilborn v. Field, 78 Pa. St. 194; Adams v. Adams, 25 Minn. 72; Muckenburg v. Holler, 29 Ind. 139; Phillips v. Thorp, 10 Or. 494.''

At the conclusion of the oral argument, upon rehearing, counsel for plaintiffs asked that consideration be given to some authorities cited in his closing argument at the original hearing. Although in point on another phase of this case, these authorities have no bearing upon the determinative question here discussed.

That question is, whether, under the facts and circumstances attendant upon its execution, the contract of July 9, 1920, as modified on July 20, 1920, has a collusive effect.

The writer thinks that the original agreement and its modification were part of the collusive agreement

induced by two of the plaintiffs at the behest of their father and hence invalid and unenforcible.

Such an agreement, in the opinion of the writer, is not enforcible whether the one seeking its enforcement had anything to do with its execution or not. The reason reference is made herein to the fact that two of the plaintiffs were active in procuring their mother's consent to the collusive agreement, is that it may be made clear that plaintiffs themselves developed the unenforcible character of the instrument in suit. That phase of the case was not called to the attention of the court by defendants.

■ The writer is not unaware that a distinction is observed at times between collusion and connivance, the former being termed a corrupt agreement while connivance is said to be a corrupt consenting. In either case, whether of connivance or collusion, the court will not lend its aid to the enforcement of a contract which is void because it is against public policy.

We adhere to the former opinion.