Decided April 19, 1897.

STATE *v.* MOORE.

[48 Pac. 468.]

| 32 | 65 |
| 32 | 598 |
| 32 | 65 |
| 38 | 286: |
| 32 | 65 |
| f46 | 32 |
| f47 | 345 |
| 32 | 65 |
| f48 | 427 |

1. CRIMINAL LAW—MISCONDUCT OF COUNSEL.—The statement by a prosecuting attorney, in his opening to the jury, of a fact which he was not entitled to prove is not ground for reversal, where the remark was promptly withdrawn from the jury by the court, and they were told to disregard it throughout the trial: *Tenny* v. *Mulvaney*, 8 Or, 513; *State* v. *Hawkins*, 18 Or. 476; *State* v. *Brown*, 28 Or. 148; *State* v. *Hatcher*, 29 Or. 309, approved and applied.

2. EVIDENCE OF ACTS OF CONSPIRATORS.—Under Hill's Annotated Laws, ? 706, subdivision 6, providing that "after proof of a conspiracy the declaration or act of a conspirator against his co-conspirator, and relating to the conspiracy," may be given in evidence, the sufficiency of the proof of the conspiracy to render such evidence admissible is largely discretionary with the trial court; and its action in admitting such evidence will not be disturbed on appeal, where there was evidence *prima facie* tending to prove the existence of a conspiracy, or from which it might be reasonably inferred.

3. HARMLESS ERROR.—The admission of evidence of acts and declarations of an alleged co-conspirator, without a sufficient preliminary showing of a conspiracy, is not prejudicial where they were insufficient to connect such alleged co-conspirator with the crime.

4. IDEM.—Evidence that after the arrest of a defendant for the larceny of money his room was searched, and several suits of clothes and a large number of other articles of wearing apparel were found, while immaterial, was not prejudicial to defendant.

5. CROSS-EXAMINATION.—While, under Hill's Annotated Laws, ? 1365, defendant can be cross-examined as a witness only as to matters to which he has testified in his examination in chief, permitting the asking of a question outside of such limit is not ground for reversal, where both question and answer were immaterial, and could not have prejudiced the defendant.

6. IMPROPER REMARKS OF COUNSEL.—A prosecuting attorney, in argument, has the right to draw such inferences or conclusions from the evidence as his reason may dictate, if warranted by the facts shown; and, unless an instruction is requested correcting any unwarranted deduction, it will be presumed that no prejudice resulted.

From Multnomah:   THOS. A. STEPHENS, Judge.

32 *Or.—5.*

C. F. Moore is convicted of grand larceny and appeals.

AFFIRMED.

For appellants there was a brief over the name of *Hume & Hall*, with an oral argument by *Mr. Wilson T. Hume.*

For the state there was a brief over the name of *Cicero M. Idleman*, attorney-general, and *Chas. F. Lord*, district attorney, with an oral argument by *Mr. Daniel J. Malarkey.*

MR. CHIEF JUSTICE MOORE delivered the opinion.

The defendant C. F. Moore was jointly indicted with George Betz and Robert Duvalle for the larceny of four gold coins, each of the value of $20, the property of the Johnson-Oliphant Company, a corporation. Upon a separate trial, Moore was convicted thereof, and, being sentenced to imprisonment in the penitentiary for the term of three years, he appeals, assigning as error the alleged misconduct of the prosecuting attorney, the admission of testimony objected to, and the giving and refusal of certain instructions.

1. Considering these assignments in the order presented, it appears that the prosecuting attorney in his opening statement to the jury, after detailing the relation which he claimed the evidence would show existed between the co-defendants, said: "We shall show you by the records of this court that the defendant George Betz was convicted in

this court upon this indictment." The court, upon
objection to this language, withdrew it from the
jury, and also said: "I will state to you, gentle-
men, that as to whether Betz has been convicted or
acquitted has nothing to do with this case; and
you will disregard any statement with regard to that
case, and under no consideration consider it dur-
ing your deliberations upon this case, when it is
finally submitted to you." Whereupon defendant's
counsel excepted to the misconduct of the district
attorney, and now contend that the remarks com-
plained of so prejudiced their client as to render
the verdict and judgment erroneous. The defend-
ant Moore, although jointly indicted for the com-
mission of a crime several in its nature, could not
be found guilty thereof upon proof of the confes-
sion or conviction of his co-defendants. In *State*
v. *Bowker*, 26 Or. 309 (38 Pac. 124), Mr. Chief Jus-
tice BEAN, in assigning a reason for this rule, says:
"Under any other rule the guilt of a defendant
jointly indicted with another, if he should happen
to be tried subsequent to his co-defendant, might
depend upon the result of a trial over which he
had not control, to which he was not a party, and
in which he had no right to appear or make a de-
fense." The defendant's guilt was not inferable
from the proof of Betz's conviction. Evidence of
the latter fact would therefore have been inadmis-
sible, if offered; and it would have been miscon-
duct on the part of the prosecuting attorney to base
an argument upon such fact, as if in evidence:
*Tenny* v. *Mulvaney*, 8 Or. 513; *State* v. *Hatcher*, 29

Or. 309 (44 Pac. 584). An opening statement by
him to the jury of a fact, the evidence of which is
not admissible, must tend in some degree to preju-
dice the rights of the adverse party; for every at-
torney of any experience who has given the subject
a moment's thought, realizes how susceptible the
jurors' minds are to first impressions, and how dif-
ficult it is to overcome or efface the imprint there-
by made. This is so because the minds of the
persons called to try the case are not then bur-
der.ed with the remembrance of conflicting state-
ments of fact thereafter to be detailed in the trial
of the cause, and, not being skilled in such mat-
ters, undue prominence is apt to be given by them
to the statements first made, which, if improper,
tend to prejudice the adverse party. This being
so, if in the opening statement the attorney con-
ducting the trial of the cause alludes to facts not
admissible in evidence, the effect must be similar
to, if not more injurious than, that produced by an
argument unsupported by evidence. It must be ad-
mitted that the remarks complained of were im-
proper, but, the court having promptly withdrawn
them from the consideration of the jury, and thus
performed its duty, the question is presented
whether the error was thus rendered innocuous. In
*State* v. *Brown*, 28 Or. 149 (41 Pac. 1042), it was
held that, the trial court having promptly set its
mark of disapproval upon the manifestation of ap-
plause exhibited by the audience at the remarks of
the prosecuting attorney, the failure to instruct the
jury in relation to the matter was not error, in the

absence of a request for such instruction. In *State*
v. *Hawkins*, 18 Or. 476 (23 Pac. 475), STRAHAN,
J., upon this subject, says:  "If counsel for the
state transcended the proper bounds of discussion,
it was the province of defendant's counsel to take
an objection at the very time of the utterance of
the objectionable words, and to take the ruling of
the court at the time upon their propriety.   Sup-
pose that objections had been promptly made to
the observations of counsel by the state, and he
had immediately desisted, there would have been
no available error: *Worley* v. *Moore*, 97 Ind. 15.
Or, if objection had been made, and the court had
ruled that counsel was not in order, the defendant
would have had no cause of exception."   Under the
rule announced in these cases, the court, by
promptly withdrawing the remarks of the prosecut-
ing attorney, thereby called attention to their im-
propriety, and neutralized as far as it could any
injury that might result from the misconduct of
that officer, which was prompted, no doubt, by the
excitement of the moment.   The prosecuting at-
torney is a sworn officer of the court, charged with
the duty of enforcing penal statutes and thereby
suppressing crime; but should he, in his zeal to
secure a conviction or to establish a reputation as
a successful trial lawyer, persist in repeating, in the
presence of the jury, language which the court con-
sidered improper, its renewed withdrawal ought not
to be held to correct the intentional misconduct.

2.   It is next contended that the court erred in
admitting the testimony of F. V. Armstrong, Sam

Simmons, and Eugene Ferguson concerning the acts of the co-defendants, Betz and Duvalle. This action was tried by the state upon the theory that the defendants had entered into an agreement to steal the money in question, in pursuance of which Duvalle kept watch on the street; Moore entered the store of the Johnson-Oliphant Company, and, obstructing the view of its occupant, engrossed her attention while Betz went in and purloined the money. And, in making the point contended for, counsel assumed that, upon the theory adopted, there was not sufficient evidence of the unlawful agreement to let in any testimony of the acts of the co-defendants. The statute provides that, "after proof of a conspiracy, the declaration or act of a conspirator against his co-conspirator, and relating to the conspiracy," may be given in evidence: 1 Hill's Annotated Laws, § 706, subdivision 6. This enactment is declaratory of and emphasizes a principle of the common law which permits the admission of hearsay testimony on certain conditions, among which are the acts and declarations of one of a company of conspirators; but before this can be done a foundation must be laid, by proof sufficient, in the opinion of the judge, to establish *prima facie* the fact of conspiracy between the parties, or proper to be laid before the jury as tending to establish such fact: Wharton on Criminal Evidence, § 698; 1 Greenleaf on Evidence, § 111; 4 Am. & Eng. Enc. Law (1st Ed.), 631. Mr. Wharton, in his work on Criminal Law (volume 2 [9th Ed.], § 1398), says: "The actual fact of conspiring may be

inferred, as has been said, from circumstances, and the concurring conduct of the defendants need not be directly proved. Any joint action on a material point, or collection of independent but co-operative acts, by persons closely associated with each other, is held to be sufficient to enable the jury to infer concurrence of sentiment; and one competent witness will suffice to prove the co-operation of any individual conspirator. If, therefore, it appear that two or more persons, acting in concert, are apparently pursuing the same object, often by the same means, one performing part of an act, and the other completing it, for the attainment of the object, the jury may draw the conclusion that there is a conspiracy." In *State* v. *Winner*, 17 Kan. 298, the defendant, having been convicted of murder in the first degree upon circumstantial , evidence tending to prove a conspiracy, appealed, and VALENTINE, J., in rendering the decision of the court affirming the judgment, says: "Ordinarily, when the acts and declarations of one co-conspirator are offered in evidence as against another co-conspirator, the conspiracy itself should first be established *prima facie*, and to the satisfaction of the court trying the cause. But this cannot always be required; it cannot well be required where the proof of the conspiracy depends upon a vast amount of circumstantial evidence,— a vast number of isolated and independent facts. And in any case where such acts and declarations are introduced in evidence, and the whole evidence introduced on the trial, taken together, shows that such a conspiracy

actually exists, it will be considered immaterial whether the conspiracy was established before or after the introduction of such acts and declarations."

But if we assume, without deciding, that the provision of our statute is mandatory, and prohibits the admission of any evidence tending to show the declarations or acts of a conspirator in relation to the unlawful combination until after proof of a conspiracy has been introduced, it will be observed that it does not prescribe the degree of proof demanded; hence it necessarily follows that the measure of evidence required in such cases must of necessity be a matter largely within the discretion of the trial court, and upon appeal the question should be, was there such evidence introduced at the trial as *prima facie* tended to prove the existence .of the conspiracy, or evidence from which it might be reasonably inferred? The wisdom of the statute under consideration is manifest; for, by a failure to observe its provisions, an innocent person might be convicted of a crime by the admissions, declarations, and acts of others, with whom he had never negotiated or entered into any agreement of an unlawful nature, in view of which the trial court ought, by its instructions, to impress upon the minds of the jurors the importance of finding that a conspiracy existed before they could consider any evidence tending to show such acts or declarations. But to hold that proof of a conspiracy must be made to the satisfaction of the jury before the declaration or act of a conspirator is admissible would not, in our opin-

ion, promote the ends of justice, nor would the section quoted justify such holding. Agreements to commit a crime, or for any unlawful purpose, being prohibited by law and public policy, are not usually evidenced by that degree of solemnity and publicity manifested in the execution of other contracts, and, this being so, the unlawful agreement must, in nearly every instance, be inferred from facts and circumstances surrounding the parties thereto; and, if this were not so, many criminals would go unpunished, to the great detriment of society. From this it would seem to follow that when any evidence offered reasonably tends to create an inference of the existence of an unlawful agreement, to the satisfaction of the judge trying the action, it would be his duty to permit the introduction of evidence tending to show the declarations and acts of the alleged co-conspirators, and thereafter to instruct the jury upon the great importance of finding that an unlawful combination had been consummated before they could consider any evidence, the introduction of which was dependent upon such finding.

An epitome of the evidence introduced at the trial, while mostly circumstantial, tends to show that the defendants Moore and Duvalle were acquainted, and had been seen in each other's company in March, 1896; that on July 16 of that year Moore and Betz arrived together at Portland, and leased for one week a room in a building on Washington street, containing a double bed, which they jointly occupied; that on the next day, at

about 11:25 o'clock in the forenoon, an agent of the Southern Pacific Company called at the store of the Johnson-Oliphant Company, and left with its clerk, F. V. Armstrong, the sum of $95.50, which was placed on a desk in the office, but within reach of a person standing in the main room of the store, which was separated from the office by a railing; that in a few minutes thereafter Betz called at the store to obtain change for a piece of money, but, failing to be accommodated, he left, but, immediately returning, Armstrong gave him, from this money still on the desk, a $10 gold piece and $10 in silver in exchange for a $20 gold piece; that in a few minutes thereafter Armstrong, having left the store on an errand, saw Moore and Betz together on Ankeny street, and about that time Duvalle was also seen on First and Ash streets, all in the vicinity of said store; that during Armstrong's absence Moore called at the store, and, seeing no one in the outer office, passed through a gate in said railing, and stood in, and thereby completely filled, a doorway opening into a back office occupied by Forence G. Crocker, the company's stenographer, of whom he inquired where he could obtain a person who would do typewriting, and the probable charges per folio therefor, and, having obtained this information, retired; that upon Armstrong's return he saw lying upon the said desk $15 50 only of the money so left there, and discovered that $80 thereof was missing. Moore was subsequently identified by Miss Crocker as the person who called and made the inquiry in respect to

typewriting, and he was also identified by Armstrong as the person he saw on Ankeny street with Betz, whom he also recognized as the person with whom he exchanged the money. We have deemed a summary statement of the testimony given at the trial to be essential to a correct understanding of that portion of it to which objection is made, and which is, in substance, as follows: F. V. Armstrong, being called as a witness for the state, testified that on July 17, 1896, he made the change with Betz, and saw him and Moore on Ankeny street. Sam Simmons also testified that in March, 1896, he saw Moore and Duvalle in each other's company on Washington street, and on July 17 of that year he arrested Moore and Betz, who were soon thereafter discharged, but subsequently re-arrested at Spokane Falls, Washington. And in explaining his reasons for making the last arrest this witness says that "On Friday night, July 17, at about 9 o'clock, Robert Duvalle passed the police station on Second and Oak streets, and I went with him down to the office of the Johnson-Oliphant Mercantile Company. Saturday morning I called upon Mr. Oliphant, and, after conversing with him, we took steps to arrest these two parties; and at 5 o'clock that evening I took a train for Seattle, and from there I went to Spokane Falls." Eugene Ferguson testified that on July 17, 1896, at about 11:30 o'clock in the forenoon, he saw Robert Duvalle on First and Ash streets, in the vicinity of, and going toward, the Johnson-Oliphant Mercantile Company's store, on the opposite side of the street. Before the testimony

objected to was admitted, evidence had been introduced tending to show that Moore and Betz were inseparable companions; that they reached Portland at the same time, jointly leased a room, and occupied the same bed therein. And this evidence being sufficient, in the opinion of the judge, to establish *prima facie* the fact of an unlawful combination existing between these. parties, he permitted evidence to be given to the jury of the acts of the co-defendants, as tending to prove the substantive offense. Viewed in the light of the rules hereinbefore stated, and realizing the difficulty of proving the unlawful combination except by circumstantial evidence, from which the fact is reasonably inferred, we think there was sufficient evidence introduced to satisfy the requirement of the statute and let in the testimony to the introduction of which objection is made: Rapalje Law Dictionary (Larceny), § 159.

3. An examination of the evidence relating to the acts of Duvalle, as tending to establish the guilt of Moore, shows that he was seen in the vicinity of the alleged crime about the time it was committed; but there does not appear much evidence to show that he either was a party to the previous agreement, or contributed very largely to its execution. It is true, he knew Moore prior to this time; but it does not seem that his association with the latter had been very intimate, or that a conspiracy could be inferred from their conduct. While this is true, however, there is no evidence of any declaration on his part, and the

only acts testified to by the witnesses were that he passed the police station, that Simmons accompanied him to the office of the Johnson-Oliphant Company, and that he was seen near its store at the time of the alleged larceny of the money. From this evidence, it would seem to have been impossible for Duvalle to have stolen the gold coins; and, this being so, we fail to see how the defendant could have been injured by any evidence of his acts.

4. Joseph Day, a city detective, being called as a witness for the State, testified that on July 17, 1896, at about noon, he arrested Moore and Betz, and took them to the city jail, from which they were taken to the photograph gallery, and back to to jail, when, upon examintion, they were discharged. On cross-examination, this witness, referring to these defendants, stated that they were arrested without a warrant, and after they were discharged the chief of police gave their property back to them; and on redirect examination he was permitted, over the defendant's objection and exception, to say that upon searching their room he found seven or eight suits of clothes, twelve hats of various kinds, fifty or sixty neckties, a number of collars and cuffs, a quantity of underclothing, a revolver, and a lot of checks on different banks in California, one of which was filled out for $200 or $300. It is contended by counsel for the defendant that the admission of this testimony was erroneous, and prejudicial to the rights of their client. It would seem that this testimony was im-

material, and its admission, therefore, harmless, for wearing apparel is, in this climate, at least, regarded as a necessity; and while a great number of suits of clothes, or many hats of various patterns, or numerous neckties of gaudy hues, perhaps, may not be deemed by some persons as the great requisite to human happiness, there may be others more fastidious in this respect, who take infinite delight in the possession of such vesture, and the effect produced by its wear. The defendant may possibly be ranked among the latter class. If so, we do not see how he could be prejudiced by the admission of testimony which enumerated his possessions in this respect, even if it was immaterial. It will be observed, also, that this testimony was given in answer to a question propounded upon redirect examination, which was suggested by an answer given on cross-examination, to the effect that the property of Moore and Betz was returned to them after their discharge from the jail; and, in any event, we cannot think its admission injured the defendant.

5.  The defendant having appeared as a witness in his own behalf, the following question was propounded to him on cross-examination:  "I will ask you if Mr. Betz did not write an account of the evidence given in the trial of his cause here, and hand the same to you?"  His counsel objected to the question, but, the same being overruled, an exception was allowed, and the witness answered as follows:  "Mr. Betz has written nothing and given me."  It is contended that this was not

proper cross-examination, and that the court erred in permitting the question to be answered. We cannot find, upon examination of the bill of exceptions, that any testimony was given on this subject by the witness in his direct examination; but this would not, in our judgment, affect the result, as the question and its answer seem immaterial. The defendant in a criminal action is a competent witness in his own behalf, and, when he offers to so testify, it shall be deemed to have given to the prosecution a right to cross-examine him upon all facts, to which he has testified, tending to his conviction or acquittal: 1 hill's Annotated Laws, § 1365. In *State* v. *Saunders*, 14 Or. 300 (12 Pac. 441), it was held that this statutory provision limited the cross-examination of such a witness to the matters testified to by him in his direct examination; but the rule there announced could not be invoked unless the testimony elicited by the cross-examination would tend to criminate the witness, or unless the refusal to answer the question propounded to him would tend to prejudice him in the minds of the jurors. This must be so, for, if otherwise, the most trivial question on cross-examination, where the defendant, as a witness in his own behalf, had not testified on the subject in his examination in chief, would be cause for the reversal of judgments in criminal actions. Such cannot have been the intention of the legislative assembly. To hold otherwise would be trifling with justice. The question and its answer were imma-

terial, and, such being the case, the defendant could not have been prejudiced thereby.

6. The prosecuting attorney, in his closing argument, alluding to the testimony given by the witness, Joseph Day, was permitted by the court, over the defendant's objection and exception, to say: "If these men were the really good men which counsel says they were; if this defendant was a good man engaged in a lawful occupation, and all that sort of thing; if he was not just what it seems to me the evidence in this case shows that he is,—a sneak thief of the most polished and accomplished character; a man that is not satisfied with traveling around with one suit of clothes, one hat, or two hats, or anything of that kind, but has to have these various changes of garments and hats, and that sort of thing, so that he can transform himself from C. F. Moore into some other person and individual, so that he cannot be recognized. It is an easy matter to change a name. It does not cost much to change a name. And I want to say to you, gentlemen, that the defendant in this case is one of the worst class of criminals, if he is a criminal." It is contended by counsel for the defendant that the deductions sought to be established in the minds of the jurors by the remarks of the prosecuting attorney were false, and permitting them to be made was an error of the court that prejudiced the rights of the defendant. It must be admitted that there is a distinguishing characteristic in the appearance of the clothing usually worn by persons engaged in the various callings and

occupations of life, which indicates to the careful
observer that the wearer belongs to one or the other
of these great classes; and if the testimony to
which the attorney alluded showed that the cloth-
ing possessed by the defendant enabled him, by
wearing one suit, to personate the farmer; by an-
other, the minister, etc., there might have been
some reason in the deduction sought, that they
were used as a means of disguise.   But would it
not show that the defendant was engaged in the
practice of "confidence games," rather than in the
calling attributed to him?   A court cannot well
supervise the reasoning powers of an attorney in
the argument of a cause before it in which he is
interested; for to do so would require it constantly
to interrupt counsel, and be tantamount to instruct-
ing the jury by piecemeal, thereby destroying the
force of the argument, and rendering it of but
little use in aiding the jury to reach a proper con-
clusion.   An attorney may comment upon the testi-
mony given in evidence, and has the right to draw
such inferences and conclusions therefrom as his
reason may dictate that the facts warrant; but, if
he make a wrong deduction, the court will, upon
request therefor, correct it by giving a proper in-
struction, and, no request therefor having been
made, it must be presumed the remarks of this
officer were harmless.   The remark that the "de-
fendant in this case is one of the worst class of
criminals, if he is a criminal," is not to be com-
mended, but it must be considered that the prose-
cuting attorney is constantly dealing with the crim-

inal classes, and in the heat of argument may use language he would not repeat upon mature reflection; but the occasion can never afford a justification for the misconduct of a prosecuting attorney, which, when prejudicial to the rights of the defendant in a criminal action, will work a reversal of the judgment: *State* v. *Hatcher,* 29 Or. 309 (44 Pac. 584). The language complained of in the case at bar was, however, so qualified in its application to the defendant that its effect could not have been prejudicial.

Exception is taken to the following instruction: "In order, therefore, to make the defendant at bar a principal in this case, it is not necessary that the state should prove that the defendant in person, and with his own hands, plainly stole, took and carried away the money from the Johnson-Oliphant Mercantile Company, in this city and county, as charged in this indictment. If it is shown to your satisfaction, beyond a reasonable doubt, that the defendant at bar aided and abetted his co-defendants, Betz and Duvalle, or either of his co-defendants, in the felonious stealing, taking, and carrying away of this money at the time charged in the indictment of the commission of this offense; if you should find that an offense has been committed, although he was not present at the time of the commission of the crime, then he would be equally guilty with the person who committed it; that is to say, if there was an agreement or understanding existing between this defendant and his co-defendants, Betz and Duvalle, or either of them, that the money — these four

$20 gold pieces — was to be taken from the office
of the Johnson-Oliphant Mercantile Company, a
corporation, and the money was taken by either
Betz or Duvalle, his co-defendants, aided and abetted
by the defendant at bar, if the defendant was not
present at the time, he would be equally guilty as
though he took it with his own hands." It is con-
tended by counsel for defendant that this instruction
is the mere statement of an abstract legal proposi-
tion, not applicable to the facts in this case, and
misleading and mischievous. If this were conceded,
it would follow that the judgment was erroneous
and should be reversed: *Pearson* v. *Dryden*, 28 Or·
350 ( 43 Pac. 166 ). But such, in our judgment, is
not the case, and could not have misled the jury.
There are several other instructions of similar im-
port to which exceptions are taken upon the same
ground as announced above, and also an exception
to the refusal of the court to give the following in-
struction: "If you are satisfied beyond a reason-
able doubt that the money described in the indict-
ment was stolen, but you have a reasonable doubt,
or are uncertain from the evidence, which person
of either two or more persons took or stole the
money, you must acquit the defendant." The object
in asking the court to give this instruction was to
modify the one given above, but, as we have con-
cluded the foregoing was proper, it follows that
there was no error in refusing to give this. It
is also insisted that the court, in refusing to com-
ply with the defendant's request to instruct the
jury to return a verdict of not guilty, committed

an error. We have carefully examined the evidence
introduced at the trial, and conclude it was suffi-
cient to warrant the jury in the conclusion they
reached. The evidence, however, is wholly circum-
stantial, and a perusal of it leads us to believe
that while, perhaps, Moore did not take the money,
the theft is explainable upon the reasonable hy-
pothesis that he stood in the door leading to the
private office, thereby obstructing the view and
attracting the attention of Miss Crocker while his
co-defendant Betz performed this part of their un-
lawful enterprise. Finding no error in the record,
the judgment must be affirmed, and it is so or-
dered.

AFFIRMED.

Decided December 7, 1897.