Decided 18 June, 1900; affirmed on rehearing 8 July, 1901.

## PACIFIC LIVESTOCK COMPANY *v.* GENTRY.

[61 Pac. 422; 65 Pac. 597.]

RIGHT OF SUPREME COURT TO MODIFY FINDINGS — REFEREES.

1. Where the testimony in a cause has been taken before a referee, the trial court has no better opportunity to determine the value of the evidence than the supreme court, and its findings are only advisory on appeal.

PUBLIC LANDS — RIGHTS OF SETTLERS — PROTECTION BY COURTS.

2. Though it is the policy of the general government, after a survey of public lands, to extend to persons who theretofore settled thereon a prior right to file on the same, and courts of equity, on behalf of such settlers or their assignees, will restrain a trespass thereon before a survey is made, yet such assignees must be qualified settlers, and where a purchaser who could not acquire title under the laws of the United States has purchased the interest in land of a settler before a survey, the title being still in the government, a court of equity will not lend its aid to such purchaser in any way.

PRINCIPAL AND AGENT — EVIDENCE — RES GESTAE.

3. Under the rule that the declarations of an agent are admissible against his principal only when made in the discharge of his duty and as part of the *res gestae*, the statements of a general superintendent of a company which was trying to acquire certain land, that the occupant thereof was in the employ of the company and acting in its interest, made to an acquaintance of such occupant in the course of an inquiry respecting his qualities of character, are competent evidence against the company in a suit between the occupant and the company over the title to such land.

COMPETENCY OF DECLARATION OF CO-CONSPIRATOR.

4. In a suit to restrain a trespass on land that plaintiff asserted defendant was claiming in defiance of his duty as plaintiff's agent and employee, where it appeared that the parties had conspired to acquire title to said land in violation of the laws of the United States, by having defendant claim the land as a homestead, though acting for and as the paid agent of plaintiff, the declarations of other of plaintiff's agents, after the defendant had commenced occupying the land and before the title had been obtained, concerning the terms of defendant's employment, and the circumstances under which he went into possession, are competent against their principal as part of the *res gestae*, for the unlawful enterprise would not be finished until defendant should convey the legal title to plaintiff: *State* v. *Magone*, 32 Or. 206, and *State* v. *Hinkle*, 33 Or. 96, distinguished.

PUBLIC POLICY — FRAUDULENT ACT OF AGENT — EQUITY.

5. A contract between a corporation and one of its employees by which the latter is to settle on certain government land in the guise of a claimant under the homestead law, in pursuance of an agreement to convey to the corporation whatever title he may acquire, is contrary to public policy and good morals; and where the employee repudiates the agreement, claiming the land for himself, equity will not interfere, but will leave the parties just where their own conduct has placed them.

EFFECT OF ILLEGAL CONTRACT — COURTS — PUBLIC POLICY.

6. When it appears in the course of a judicial proceeding that a contract under consideration is contrary to good morals and against public policy, it is the duty of the court, *sua sponte*, to dismiss the proceeding, whether the objection is made or not: *Ah Doon* v. *Smith*, 25 Or. 89, applied.

From Malheur: MORTON D. CLIFFORD, Judge.

Suit to enjoin an alleged trespass, in which defendant successfully asserted title to the premises in controversy, whereupon the plaintiff appealed.                    AFFIRMED.

*Mr. John L. Rand* for appellant.

*Messrs. Turner & Biggs* for respondent.

MR. JUSTICE MOORE delivered the opinion of the court.

This is a suit by the Pacific Livestock Company (a corporation) against James Gentry to enjoin an alleged trespass, and to recover damages therefor. The facts are that one James Sullivan, having settled on unsurveyed public lands of the United States known as the "Rinehart Springs Ranch," in Malheur County, Oregon, cleared about 40 acres thereof, which he sowed to alfalfa, irrigating it with water from springs thereon, and about 1888 sold said improvements to plaintiff, a corporation engaged in raising cattle in Harney and Malheur counties. This ranch is situated on the Owyhee River, which at that place has almost precipitous banks from 1,000 to 1,500 feet high, so that it is impossible

for cattle to descend to the river for water. The table-lands in the vicinity afford good pasturage for cattle, which, for a radius of about ten miles, find water only at said springs. After purchasing these improvements, plaintiff built a flume on the ranch, cleaned out the old ditch, increased the area of cultivated land, and built corrals and fences, expending about $5,000 in the original purchase and subsequent improvements. The ranch annually yields from 100 to 150 tons of alfalfa hay, which is cut and stacked on the place, and fed to the cattle on the range during the winter. The plaintiff has kept an employee on the ranch to irrigate the alfalfa, to feed and care for the stock, and to look after its interests; furnishing him food, cooking utensils, a team, wagon, harness, machinery, and farming tools. In October, 1894, plaintiff's superintendent, having learned that the employee in charge of the ranch intended to claim it in his own right, removed him, and engaged the defendant in his stead; agreeing to pay him $25 per month for his services. At that time the defendant was 62 years old, his shoulder had been broken, and, the dislocation never having been reduced, his left arm was nearly useless; and he had also suffered several strokes of paralysis,—notwithstanding which he was able to irrigate the alfalfa and look after the ranch, to which he immediately moved; and, having no family, he lived alone in the house thereon, remote from neighbors. In 1898 the townships in which the Rinehart Springs are situated were surveyed by a deputy United States surveyor, and it was ascertained that plaintiff's improvements were upon the following described premises: The N. E. ¼ of the N. E. ¼ of section 24 in township 27 south, of range 41 east, of the Willamette Meridian, and the S. W. ¼ of the S. W. ¼ of section 18, the N. W. ¼, the E. ½ of the S. W. ¼, and the S. W. ¼ of the N. E. ¼ of section 19 in township 27 south, range 42 east, of said meridian; but the plat of said survey has never been approved by the interior department.

After the location of said ranch was thus established, defendant, claiming to be entitled to file a homestead entry upon a part thereof, to wit, the W. ½ of the N. W. ¼ and the N. E. ¼ of the S. W. ¼ of said section 19, built a small cabin thereon, into which he moved, and in which he lived a part of the time; and in 1898 he cut the alfalfa hay growing on the land so claimed by him, 60 tons of which he sold, realizing therefrom the sum of $300.

Under an act of congress approved June 4, 1897 (30 Stat. 36), one F. A. Hyde, having selected the land included in the Rinehart Springs Ranch, and such selection having been approved, executed deeds to plaintiff, relinquishing all his interest in said premises. The plaintiff, having secured said deeds, instituted this suit, alleging that it is the owner in fee of the real property known as the "Rinehart Springs Ranch," particularly describing the same; that the defendant was employed by it to take charge of said premises; that while so employed he converted to his own use about 150 tons of hay cut from and stacked on said land by its employees; that he willfully ejected its servants from the said ranch, and refused to permit them or the plaintiff's agents to go upon or take possession of the land, and wrongfully claims to be the owner thereof, to plaintiff's damage in the sum of $2,000. The defendant, after denying the material allegations of the complaint, avers that on October 21, 1894, he was a citizen of the United States over the age of 21 years, and qualified to make a homestead entry on its public lands; that on said day the W. ½ of the N. W. ¼, the N. E. ¼ of the S. W. ¼, and the N. W. ¼ of the S. W. ¼ of section 19, in township 27 south, of range 42 east of the Willamette Meridian, being unsurveyed public lands of the United States, he settled thereon, claiming the same under the homestead laws of the United States, and intending to make an entry thereof as soon as he could file thereon; that ever since he established such residence he has been in the

quiet and peaceable possession of said land, complying with all the requirements of the laws of the United States respecting such residence and the cultivation of said premises; and that he is entitled to the exclusive possession thereof. The reply having put in issue the allegations of new matter contained in the answer, the cause was referred to W. L. Coleman, and from the testimony taken by him the court found, in effect, that defendant was qualified to make a homestead entry on the public lands of the United States, that on the said twenty-first day of October, 1894, with plaintiff's advice and consent, he settled upon the land so claimed by him, intending to enter the same under the laws of the United States as soon as the plat of the survey thereof was approved, and the lands susceptible of entry; that he went upon said land under an agreement to put up the hay annually raised thereon, to feed the same to plaintiff's cattle, and to maintain a camp at said ranch to accommodate plaintiff's employees, in consideration of which plaintiff promised to pay him $25 per month, and to supply him with the necessary provisions, stock, and machinery; that he did not settle upon said land in pursuance of any agreement with or employment by the plaintiff, nor did he at any time hold the premises for its benefit; and that the plaintiff was not at any time since October 21, 1894, the owner or in the possession of the land so claimed by him, or any part thereof. And, having rendered a decree dismissing the suit, the plaintiff appeals.

A careful examination of the testimony leads us to conclude that the court erred in finding that the defendant did not enter into possession of the Rinehart Springs Ranch in pursuance of any agreement or employment with plaintiff, and that he did not hold the premises for its benefit. The defendant's theory is that plaintiff surrendered to him all its interest in the land, and paid him $25 per month for three years, in consideration of the hay grown on the place and

the use of the pasture thereon.   He testified, in substance, that Charles Jones, now deceased, then the plaintiff's assistant superintendent, put him in possession of the premises, and told him to stay there and work for the plaintiff until the land was surveyed, and then to file on the same as a homestead, and that in October, 1894, he settled thereon, with the intention of claiming it as a homestead, and from that time it had been his intention to file upon the land as soon as he could do so; that he was to stay on the place and help raise all the hay he could for plaintiff, in consideration of which it paid him $25 per month for the hay and the use of the pasture.   On cross-examination he was asked if he was not hired to take the Rinehart Springs Ranch and occupy it for the Pacific Livestock Company. · Instead of giving a direct answer, he replied: "I never promised to deed it to anybody."   On further cross-examination, he was asked: "You knew all the while when you went on that place that the company expected you to hold it for them, or they would not have put you there?"—to which he replied: "They might have, but I didn't.   Q. You understood they did, did you?  A.  I suppose; I expect they thought they would take chances on it, that is all."   P. Madison, an employee of plaintiff, testified that he was present when Jones engaged the defendant, who, under the agreement, was to go to the Rinehart Springs Ranch, stay there, work for and represent the Pacific Livestock Company, and hold the ranch for it until it could get a title, and that the defendant had always told him he was holding possession of the land and improvements for the company, to which they belonged.   K. Kilbourn, another of plaintiff's employees, testified that the defendant had always told him he was holding the ranch for the Pacific Livestock Company, which was to pay him $25 a month for staying on the land until it could secure a title thereto.   John Gilchrist, plaintiff's superintendent, in referring to a conversation which he had with the defendant, said:   "In August,

1898, I talked with Gentry as to what his contract was with the company. I says, 'Jimmy, what was the agreement made when you came with Jones,—when you came out here?'— and he says: 'It was to stay on this place, and hold the place for the company. I was to get $30 per month, and,' he says, 'afterwards it was changed to $25.' 'I afterwards told you,' says I, 'that I would give you $200 extra, didn't I, when we secured the title?' and he says: 'Yes, sir; you did.'" This testimony, we think, substantiates the conclusion we have reached regarding the relation existing between the parties, and shows that plaintiff employed him to take possession of its ranch, and to hold it for its benefit. That plaintiff, a corporation, should voluntarily give to the defendant all its interest in this valuable ranch, the improvements upon which cost it about $5,000, thereby depriving itself of property that was very valuable by reason of the water thereon affording, as it did, the only means of carrying on the business of cattle raising in that vicinity, and also paying him, notwithstanding his age and infirmities, the sum of $25 per month for several years, expecting no other return than the hay and pasturage which the land furnished, is beyond belief, and, if true, would evidence a degree of magnanimity unparalleled in the history of private corporations.

1. The testimony having been taken before a referee, the trial court possessed no greater advantages in determining its weight than are enjoyed by this court, and hence we have no hesitancy in changing the findings to which attention has been called.

2. A court of equity will not permit an agent to take advantage of his fiduciary relation, and, when necessary, will enjoin him from defrauding his principal: 2 High, Inj. (3 ed.), § 1559. The defendant, having been employed by plaintiff to protect its interests and to guard its property rights in the Rinehart Springs Ranch, ought not to be permitted to violate his trust and derive a benefit from a betrayal thereof,

if the plaintiff's conduct in employing him does not violate the maxim that he who comes into a court of equity must come with clean hands. It may be admitted, we think, that plaintiff's agents were very anxious that their principal should secure the legal title to the land from which the Rinehart Springs emanated. These springs furnishing the only water accessible to stock for many miles, the owner thereof would necessarily control the pasturage on the table-lands in the vicinity. In about 1888 plaintiff's agents, having discovered the advantages which these springs afforded, purchased the improvements of the person who settled on the ranch, and thereafter made every reasonable effort to secure the title to the lands; but, the township in which the springs are situated not having been surveyed, plaintiff's right to the improvements so purchased depended upon its possession, and, this being so, the necessity of always keeping some employee at the ranch to represent its interests and to defend its rights is apparent. The Rinehart Springs being remote from any settlement, plaintiff found it difficult to secure a servant who would remain at the place for any length of time. Gilchrist, the superintendent, illustrates this difficulty by stating that an employee, upon his return from a short stay at the ranch, said to him: "I would not stay on that place another day if you would give me the place and all the cattle the company has got. That is the most lonesome place I ever saw in my life. I would jump off the rimrock and go crazy." The defendant, however, was taciturn, disliked society, and had indomitable courage,—qualities which fitted him for the discharge of the duties devolving upon him; and this explains the payment of the wages he received, notwithstanding his age and debility.

The usual policy of the general government for many years, except in cases of extensive grants to aid corporations in developing the country, has been to reserve the public domain for its citizens, who have been permitted to secure title

to tracts of certain area upon condition of *bona fide* settlement and cultivation.   They have been permitted, by a tacit license of the United States, to settle upon and cultivate the public land prior to its survey; and such settlement has been recognized by the officers of the interior department of the government, as conferring upon the settler a prior right to file upon the same in the local land office, when surveyed. Courts of equity, acting upon 'the recognition of such settlement as conferring an inchoate right to the land, and invoking the maxim that equity will not suffer a wrong without a remedy, have enjoined the disturbance of such right by parties who would trespass upon the land so settled upon: *Kitcherside* v. *Myers,* 10 Or. 21; *Jackson* v. *Jackson,* 17 Or. 110 (19 Pac. 847).   "The right of such a settler being property," says Mr. Justice BEAN in *Hindman* v. *Rizor,* 21 Or. 112 (27 Pac. 13), "he may sell and transfer it so as to pass his right thereto, and, except as against the government, vest the rightful possession in the purchaser."   The legal principle thus announced will, of course, be understood to relate to the transfer of such possessory right to one who is or may, under the provisions of law, become entitled to secure directly from the government a legal title to the land so claimed.   The purchaser not being able to tack his settlement to that of his predecessor, the effect of the transfer is the initiation of a new right by which the prior settler surrenders his interest in the premises to the United States, which tacitly licenses the purchaser to take and hold the possession with the intention of securing the title.   To become such licensee, the purchaser must be a qualified settler; that is, he must be a citizen of the United States, or capable of becoming such in the manner prescribed by the acts of congress, and must make a *bona fide* settlement upon the land in person, with intent to obtain the title to the same by complying with the provisions of the land laws of the United

Sates: *Peterson* v. *First Div. Ry. Co.,* 27 Minn. 218 (6 N. W. 615).

Plaintiff did not make, and was not capable of making, a settlement in person upon the land; and it was not, nor could it become, a citizen of the United States, in the sense required by the acts of congress, and hence it was not a qualified settler upon the public domain. To permit a corporation to hold public lands, the improvements upon which had been transferred to it by a settler, would thwart the public policy of the government, and often enable the purchaser of such improvements to control, as in the present instance, vast areas of grazing lands, in consequence of securing the use of the waters, which alone render such lands valuable. Our attention has been called to the case of *Tidwell* v. *Chiricahua Cattle Co.* (Ariz.), 53 Pac. 192, which seems to tolerate such conditions, but that case was an action at law under a statute of Arizona which permitted ejectment to be maintained upon proof of settlement upon and cultivation of public lands. Whatever the rule may be in an action at law, we cannot think that the claim of a private corporation to hold possession of public lands, thereby preventing actual settlers from securing the advantage of the laws enacted for their benefit, appeals very strongly to a court of conscience. Plaintiff, being a private corporation, could not, under such general policy, secure in its own right the title to any of the public lands of the United States; but, the Rinehart Springs Ranch being very valuable to the plaintiff, it adopted a method to circumvent the policy of the general government, and to secure the title to this property, so necessary to the prosecution of its business.

Gilchrist testified that prior to 1897 the Pacific Livestock Company expected to secure the title to the Rinehart Springs Ranch by state selection. As we understand the witness, the mode thus intended to be pursued undoubtedly contemplated a selection of the tracts which plaintiff desired by an

agent of the State of Oregon, as indemnity lands, under the provisions of Section 3597, Hill's Ann. Laws, after the townships in which the springs were situated had been surveyed, and the plats thereof approved. Assuming that the state had thus acquired the desired tracts, plaintiff, being a private corporation, could not secure title to them, except through applicants therefor whom it might induce to make the affidavit required by Section 3600, Hill's Ann. Laws, that no contract or agreement, express or implied, had been made for the sale or other disposition of such lands in case they were permitted to purchase the same, and, after deeds therefor had been executed by the state to such applicants, persuading them to transfer to it the title thus secured. It will thus be seen that the method contemplated by which it was expected that the title to the Rinehart Springs Ranch could be secured by plaintiff would seem to imply subornation of perjury. Congress passed an act, approved June 4, 1897, by which a settler upon public lands, or a person who held a title thereto, within the boundaries of any forest reserve, might surrender to the United States his possessory right, or transfer such title and take other public lands in lieu thereof: 30 Stat. (U. S.), 36. One F. A. Hyde, having taken advantage of such act, selected the said Rinehart Springs Ranch, and, his selection having been approved, he executed deeds to plaintiff, relinquishing his right in the premises; but the act, having been passed after defendant was engaged to look after plaintiff's interest in and to defend the premises, does not change, in equity, the consequences which follow the original intent by which it was expected the title could be secured.

3. An examination of the testimony induces the belief that each party attempted to hide the real terms of the agreement entered into between the defendant and Charles Jones as agent and on behalf of the plaintiff. Jones having died prior to the trial herein, his alleged declarations respecting

the nature of such agreement, made after defendant moved to the Rinehart Springs Ranch, were admitted in evidence over plaintiff's objection and exception on the ground that they formed no part of the *res gestae.* Our statute regulating the general principles of evidence provides that the rights of a party cannot be prejudiced by the declaration, act, or omission of another, except by virtue of a particular relation between them: Hill's Ann. Laws, § 684. The rule is well settled that the declarations of an agent are admissible in evidence against his principal only when they are made in the discharge of his duty, and form a part of the *res gestae:* 1 Am. & Eng. Enc. Law (2 ed.), 1143, and notes; 1 Greenleaf, Ev. (14 ed.), § 113; Story, Ag. (9 ed.), § 134 *et seq.; Mateer* v. *Brown,* 1 Cal. 221 (52 Am. Dec. 303) ; *Ward* v. *Preston,* 23 Cal. 468; *Van Dusen* v. *Star Quartz Min. Co.,* 36 Cal. 571 (95 Am. Dec. 209) ; *Green* v. *Ophir, etc., Min. Co.,* 45 Cal. 522; *Bee* v. *San Francisco, etc., R. R. Co.,* 46 Cal. 248; *Wicktorwitz* v. *Farmers' Ins. Co.,* 31 Or. 569 (51 Pac. 75). Jones' alleged declarations, being in the nature of admissions by a conspirator, are not admissible in evidence against his co-conspirators until after proof of the conspiracy has been given: Hill's Ann. Laws, § 706. In construing this section in *State* v. *Moore,* 32 Or. 65 (48 Pac. 468), it was held that the declarations of an alleged conspirator were admissible in evidence after testimony had been given which *prima facie* tended to prove the existence of a conspiracy, or from which it might reasonably be inferred. See, also, 6 Am. & Eng. Enc. Law (2 ed.), 868. Can it be reasonably inferred from the evidence that a conspiracy had been entered into whereby the defendant agreed to secure the title to the Rinehart Springs Ranch for the plaintiff? The testimony shows that the superintendent of the Pacific Livestock Company, having discovered that the person employed to look after its interests in the ranch intended to claim the premises in his own right, discharged him and employed the

defendant, in whom trust was reposed. The latter's evasive answer to the question as to whether he was not hired to take charge of and to occupy the ranch for the Pacific Livestock Company, above quoted, creates an inference that he agreed with Jones to take the place, as he testified, in his own right. This inference is strengthened by the testimony of Gilchrist, who, in speaking of the character of the defendant's possession, says: "Jimmy was always looked upon as being in charge of the place, and we—and I—had all the men to defer to him in that particular, because it pleased the old man, and he felt that he was in charge—in authority; and I told them always to rather recognize his authority. It didn't cut any ice, anyway—didn't hurt them; and it made Jim more pleasant, and he was never too pleasant." In the summer of 1897 the defendant, having been informed by some one that he was to be dismissed from plaintiff's service, became dissatisfied, whereupon Gilchrist told him that his discharge was never contemplated, and testified that he said to him: "I will tell you further, Jimmie, right now, I will give you $200 over and above your wages when the whole business is wound up, for faithfully staying on that place." When it is remembered how aged and infirm the defendant was, we think it is fairly inferable from the promise to pay him $200 in addition to his wages of $25 per month that he agreed to take the land in his own right for plaintiff's benefit. Gilchrist also testified, in substance, that he secured the appointment of a person as deputy United States surveyor, and paid him $700 to survey the township in which the Rinehart Springs are situated, but, the survey made by him not having been approved, he told the defendant to file on the land, the boundaries of which were determined by such survey, as a desert claim, but upon examining the affidavit which an applicant for lands of that character was required to make, to the effect that no portion thereof was in cultivation, he found it impossible to secure the title in this manner. The testi-

mony to which attention has been called on this branch of the case leads us to conclude that it is fairly inferable therefrom that an agreement had been entered into whereby the defendant was to perfect a title to the premises, and convey the same to plaintiff.

4. The next question to be considered is whether the alleged declarations of Jones were admissible in evidence, having been made after the defendant had moved to the Rinehart Springs Ranch. It has been repeatedly held by this court that statements made by a conspirator after the common enterprise has ended, and not in the presence of the coconspirators, are inadmissible in evidence against the latter: *Sheppard* v. *Yocum,* 10 Or. 402; *Osmun* v. *Winters,* 30 Or. 177 (46 Pac. 780); *State* v. *Tice,* 30 Or. 457 (48 Pac. 367); *State* v. *Magone,* 32 Or. 206 (51 Pac. 452); *State* v. *Hinkle,* 33 Or. 93 (54 Pac. 155). "To this rule, however, an exception has been recognized where the declarations were made with reference to a subsisting interest in property fraudulently acquired pursuant to a conspiracy": 6 Am. & Eng. Enc. Law (2 ed.), 870; *State* v. *Thaden,* 43 Minn. 253 (45 Pac. 447); *Com.* v. *Smith,* 151 Mass. 491 (24 N. E. 677); *Baker* v. *State,* 80 Wis. 416 (50 N. W. 518). The unlawful enterprise, if it existed, was initiated when the defendant, in pursuance of an agreement to secure the title for plaintiff, took possession of the Rinehart Springs Ranch, and would have continued until he performed his part of the contract by executing a deed to plaintiff of the premises. The declarations imputed to Jones are alleged to have been made while the unlawful combination existed, and before the fruits thereof were conveyed to plaintiff, and are substantiated by the testimony of Maurice Fitzgerald, a former employee of plaintiff, who had known the defendant 27 years, and who, being called as his witness, details a conversation with Charles Jones illustrative of the method so adopted by plaintiff. He says: "Some time in the fall of 1894 Mr.

Jones came to me, to the Island Ranch,—I was at that time on the Island Ranch, in the employ of the company,—and he asked me if I would take a wagon over to the Rinehart Springs Ranch for him; that he had nobody else there at the time that he could send; and I told him that I would. And then he told me that he had just got Jimmy Gentry, and had sent him over to the Rinehart Springs Ranch, and he also went on to speak about the Rinehart Springs Ranch at considerable length, stating that the company had had a good deal of trouble with that place, and that different parties had been talking of trying to get away with it from the company, jumping it, and one thing and another; and he said that he had met old Jimmy, and told him to go out there and take possession of those premises, and to hold possession of the place as a squatter, and to allow nobody else to come upon the place, but to claim it as his. And also he told me the terms that he and Mr. Gentry had agreed to as to the holding of the place. He told me that he had agreed to pay Gentry $25 per month, and that Gentry was to do all the work that he possibly could, keep the ditch in repair, irrigate the alfalfa, and everything on the ranch, and that, whenever there was any assistance needed, that he would send men from the Harper Ranch to help him; and that the company was to have all the products of the place, and, of course, he said that he had told Gentry that whenever the land was surveyed he could go ahead and file on it, and after he had proved up on it he could do what he pleased with it; that, if he felt like selling it to the company, all right; and they would expect, anyhow, that he would give them the first chance on it. And he asked my opinion about the matter,— what I thought as to getting Gentry there. He thought, he said, that Gentry was a man of his word, and that he would do the fair thing with the company. And I told him that, under that condition, I believed he could not have made a

better selection for the place; that I had known Gentry for a long time, and believed that he was a man of his word, and would do everything he agreed to do; and told him that there was one thing I was sure of,—that nobody could bluff him off; no sheep man nor anybody could come and run him off; that he would hold possession if he had to hold it with a rifle." The testimony shows that Jones was plaintiff's agent when such declaration was made, and that the questions propounded by him to Fitzgerald concerning defendant's qualifications related to the discharge of his duty. Assuming that, if Fitzgerald's answers had revealed Gentry's untrustworthiness, Jones would have immediately discharged him, and engaged another person in his stead who could be trusted, such declarations, having been made while the agreement with Gentry remained unexecuted, were admissible in evidence against the plaintiff, as Jones' principal, and also against the defendant, a co-conspirator, as a part of the *res gestae* in each instance.

5. We think the testimony shows that a conspiracy existed whereby the defendant was engaged to secure the title for plaintiff, and such agreement tended to violate public policy, by securing for a private corporation land intended by the United States for its *bona fide* settlers.

6. The remaining question is whether a court of equity, upon the discovery of such fact, will dismiss the suit of its own motion. In *Ah Doon* v. *Smith,* 25 Or. 89 (34 Pac. 1093), it is held that if the illegality of a contract sued on appear from the testimony of plaintiff's witnesses, although not pleaded in the answer, the court, of its own motion, ought to dismiss the action. To the same effect, see *Buchtel* v. *Evans,* 21 Or. 309 (28 Pac. 67); *Bradtfeldt* v. *Cooke,* 27 Or. 194 (50 Am. St. Rep. 701, 40 Pac. 1); *Miller* v. *Hirschberg,* 27 Or. 522 (40 Pac. 506). No defense was interposed on account of the illegality of the contract, but it is inferred from the testimony of plaintiff's witnesses that the agreement en-

tered into between plaintiff and defendant violated public policy, and, this being so, it did not come into a court of equity with clean hands; and under the rule announced in this state the trial court was authorized to dismiss the suit, and, having done so, the decree is affirmed.   AFFIRMED.

Decided 8 July, 1901.

## ON REHEARING.

*Mr. John L. Rand* for appellant.

*Mr. Dalton Biggs for respondent.*

MR. JUSTICE MOORE delivered the opinion of the court.

A rehearing of this cause having been had upon appellant's petition therefor, we conclude, after a careful re-examination of the testimony, that the inference spoken of in the former opinion, so far as it relates to any agreement of the defendant to convey the Rinehart Springs Ranch to plaintiff upon securing a title thereto, is not deducible therefrom. The testimony of Gilchrist, plaintiff's superintendent, that no agreement was ever entered into with Gentry, by the terms of which he was to prove up on the land and give the company the first chance to buy it, is corroborated by Gentry, who testifies that he never promised to deed the land to anybody; that Charles Jones, the plaintiff's assistant superintendent, placed him in possession, telling him to stay on the place until it was surveyed, and then to file on it as a homestead. This latter statement is corroborated by E. Mefford, who testifies that Jones told him Gentry owned the place, and by Maurice Fitzgerald, who says that Jones told him Gentry was to file on the land when it should be surveyed. The defendant's testimony in this particular would seem to be corroborated also by Gilchrist, who states that he instructed plaintiff's employees to recognize Gentry's authority, as be-

ing in charge of the premises, and by the circumstance that Gilchrist promised to pay him the sum of $200 in addition to his wages when the company should secure the title. P. Madison, C. C. Kilbourn, and Gilchrist, plaintiff's employees, testify that Gentry agreed to hold the land for the company until it could prove up thereon, the latter witness saying: "We never dreamed that Gentry was going to be there five or six years"; and J. C. Foley, plaintiff's witness, "that the company owned the improvements on that land, and they proposed to acquire title to it through somebody else." We think the preponderance of the testimony shows that Gentry was the person selected by the plaintiff's agents for this purpose, and while, perhaps, no express contract was ever entered into whereby it was stipulated that he would convey the land to the plaintiff when he should secure the title, it was understood that he would do so, and he was sent to the place to hold it for the company, whose agents reasonably expected him to convey the land to it when his title should have been perfected. This conclusion seems to be borne out by the testimony of the defendant, who, in speaking of such expectation of plaintiff's agents in sending him to the ranch to hold it for them, said, "I expect they thought they would take chances on it," and is fairly inferable from the attempt made by Gilchrist to have him make a filing on the ranch under the acts of congress providing for the sale of desert lands in certain states and territories: 19 Stat. 377, c. 107; 26 Stat. 1096, c. 561.

The Rinehart Springs Ranch having been unsurveyed public lands of the United States when James Sullivan, the plaintiff's predecessor, settled thereon, his claim thereto was that of a "squatter," in speaking of which Mr. Justice MINER, in *Rio Grande W. Ry. Co.* v. *Telluride Power Transmission Co.;* — Utah, — (63 Pac. 995), says: "A homestead or squatter's right is a personal right, and the possession under it must be personal." The plaintiff, being a private corpora-

tion, was, by reason of its intangibility, incapable of taking personal possession of the premises, and in order to secure the title, under the ordinary acts of congress in relation thereto, the necessity of securing some one who would do so for it is apparent. It was believed that Gentry possessed such a determined disposition that he was capable of resisting all encroachments upon the land, and that his reputed honesty would not permit him to retain the title to the very valuable property intrusted to his keeping. Gilchrist as a witness says Jones had no authority to give this ranch to Gentry, and it cannot be supposed that he intended to donate the improvements to him. By reason of Gentry's bravery he was sent to the land in question to prevent trespassing thereon, and in consequence of his supposed probity he was instructed to file his homestead claim on it, under the very reasonable expectation that when he secured a title thereto he would, in consideration of the wages received and of the further sum of $200 which had been promised, convey the land to the plaintiff. If an express agreement had been entered into whereby the defendant was to convey the premises to the plaintiff after he had secured a title thereto, under the homestead laws of the United States, such contract could not have been enforced, after the entry was consummated, because it would have been for the commission of a fraud upon the general government, as being violative of Section 2290, Rev. Stat. U. S., which requires a homestead claimant to take an affidavit that the entry is made for his exclusive use and benefit, and not, either directly or indirectly, for the use or benefit of another: *Clark* v. *Bayley,* 5 Or. 343; *Moore* v. *Moore,* 130 Cal. 110 (80 Am. St. Rep. —, 62 Pac. 294). Public policy must necessarily be as much violated by the exercise of an unlawful intent, manifested by surrendering the possession of unsurveyed land, under the reasonable expectation that the person to whom the possession is delivered will secure a title to the premises under the homestead laws of the United States, and convey the land to the beneficiary, as though an

express contract to that effect were entered into between the parties. That the plaintiff's agents reasonably expected Gentry to make a homestead filing upon the land when it was surveyed, and to convey the premises to the plaintiff when he secured the title thereto, is clearly established, we think, from the testimony, and, though no defense on the ground of an infraction of public policy was interposed, it is the duty of the court to refuse to lend its aid whenever a transaction, in terms or by reasonable intendment, conclusively appears to be *contra bonos mores*. Mr. Chief Justice RYAN, in *Wight v. Randskopf,* 43 Wis. 344, in speaking of the obligation of a court in cases of such character, says : "If the objection be not made by the party charged, it is the duty of the court to make it on its own behalf. Courts owe it to public justice and to their own integrity to refuse to become parties to contracts essentially violating morality or public policy, by entertaining actions upon them. It is judicial duty always to turn a suitor upon such a contract out of court, whenever and however the character of the contract is made to appear." The defendant having attempted to perform the very service for which he was employed, a court of equity, in view of the circumstances, will not become a party to the transaction by enjoining him therefrom. We are compelled, therefore, to adhere to the former opinion. AFFIRMED ON REHEARING.

Decided 9 July, 1900 ; affirmed on rehearing 8 July, 1901.