## CULLISON *v.* DOWNING.

[71 Pac. 70.]

ILLEGAL CONTRACT—PUBLIC POLICY—DUTY OF COURT.

1. Considered with reference to the enforcement of a contract, public policy is not so violated as to require judicial notice and action *sua sponte,* unless the conduct complained of was an intentional omission of some required duty, or the willful commission of some prohibited act: *Miller v. Hirschberg,* 27 Or. 522, explained.

ILLEGAL CONTRACT—DUTY TO DISMISS CASE.

2. It is the duty of a trial court to dismiss a legal proceeding based on an unlawful contract whenever the fact appears, though not pleaded, and leave the parties to their own devises.

REVIEW OF FAILURE TO DISMISS CASE SUA SPONTE.

3. Even though the illegality of a contract in litigation has not been in any way suggested to or considered by the trial court, the question may be first raised on appeal, for the action of the lower court in not considering the question of public policy was not an exercise of its discretion, but a determination of a question of law, and hence reviewable.

From Multnomah: ALFRED F. SEARS, JR., Judge.

This is an action by J. E. Cullison to recover money. It is alleged in the complaint that the defendants, F. O. Downing and F. H. Hopkins, are partners, and during the time stated were engaged as such in the grain and stock brokerage business; that from March 25, 1896, to April 24, 1897, plaintiff, at their request, performed service for them, for which they agreed to pay him $60 a month and 10 per cent of the gross earnings of their business, which, during the time, were $105,-000; that his share thereof, and the wages agreed upon amount to $11,280, but he has received thereon only $2,892, and that there is due him $8,388, for which judgment is demanded. The answer denies the material allegations of the complaint, and for a separate defense avers that the total commissions accru-

ing to defendants by reason of their business during the time alleged was only $24,547.70, 10 per cent of which and the stipulated wages were paid to and accepted by plaintiff in full satisfaction of his services. For a further defense it is alleged that during each month while plaintiff was so employed he, with knowledge of all the facts relating thereto, presented to them statements showing the wages and percentage due him, setting out said sums, and that in pursuance thereof they were paid to and accepted by him in full satisfaction of said awards and settlements. The reply, having put in issue the allegations of new matter in the answer, averred that the statements so rendered were based upon incorrect information, knowingly and falsely furnished by defendants to plaintiff, who had no knowledge of their falsity, or means of ascertaining the same, as defendants well knew; and that, relying thereon, he, at their request, rendered said bills, which subsequent information has shown to be false. The cause, upon defendant's motion, supported by Downing's affidavit that the trial would require the examination of long and complicated accounts necessitating an examination of their books, was referred to Raleigh Stott to take the testimony and report his findings of fact and of law therefrom. At the trial before the referee the defendants, claiming that an examination of their books might tend to incriminate them, refused to offer them in evidence, though required to do so. The referee found in favor of plaintiff, but his report was set aside, and the cause re-referred to S. C. Spencer, who, upon examination of the testimony so taken, made findings of fact and concluded that there was due plaintiff from defendants the sum of $8,388, and from the judgment against them therefor they appeal.      REVERSED.

For appellants there was a brief over the names of *Cotton, Teal & Minor* and *John H. Woodward,* with an oral argument by *Mr. William W. Cotton.*

For respondent there was a brief over the names of *John H. Hall, Edw. & A. R. Mendenhall,* and *Dan J. Malarkey,* with an oral argument by *Mr. Edw. Mendenhall* and *Mr. Malarkey.*

MR. CHIEF JUSTICE MOORE, after stating the facts, delivered the opinion of the court.

It is contended by defendant's counsel that the testimony introduced by plaintiff shows that the gross earnings, a share of which he seeks to recover, were secured in contravention of public policy, of which fact he, at all the times mentioned, had knowledge, and, this being so, the court erred in not dismissing the action. The bill of exceptions discloses that on March 25, 1896, the defendants formed at Portland, Oregon, a partnership for the ostensible purpose of purchasing and selling on commission for their customers grain or options in the Board of Trade of Chicago, Ill., at which time they entered into a contract with plaintiff, a telegraph operator, agreeing to pay him for his services as such $60 a month and 10 per cent of the commissions earned by them. Plaintiff performed service for defendants from March 25, 1896, to April 24, 1897, during which time they daily gave him statements purporting to show the purchases and sales of grain made by them for their customers, whereby it was made to appear that they had earned $21,120 as commissions, a memorandum of which he kept, and upon his rendering them a monthly report of said commissions they paid him 10 per cent thereof, and also the wages agreed upon. Plaintiff severed his connection with defendants on April 24, 1897, having prior thereto inspected their books, and, as he claims, ascertained therefrom that their gross earnings during the time he was employed by them were $105,000, and commenced this action to recover 10 per cent of the difference between $21,120, the sum of the daily statements so made to him, and the gross earnings. The plaintiff testified that prior to March 25, 1896, he was in business at Portland, Oregon, with the defendant Downing as a partner, and engaged in buying and selling grain on commission; that, a partnership having been formed between the defendants at that time, he was employed by and worked for them from 7 or 7:30 A. M. to 1:20, and sometimes until 5 P. M., in their office at Portland, continuously until April 24, 1897, except a few days when he may have been ill or out of the city; that his business was to receive

and transmit telegraphic messages, including market quotations; that he knew of orders given to the defendants by customers to buy or sell wheat for them that were not sent out of the office; that about April, 1896, having learned that such orders were retained by the defendants, upon inquiry they informed him that they were crossing all orders received that were not sent to Chicago, and in speaking of this method the witness said, ''I supposed it was all right;'' that in carrying the trade of a customer the defendants gained what he lost; that the witness received telegrams from customers addressed to the defendants, requesting them to buy or sell wheat, but he sent not more than 1 per cent of these orders to Chicago; that the defendants represented to their customers that they were charging commissions, and he did not know that they were making money in any other way, but, seeing that they were profiting by the crossing of the orders and by carrying the trade themselves, he claimed a share of the money so secured, and, in speaking of the sum of $10,700, made by the defendants at a given time on orders not sent to Chicago, he said, ''The customers lost it, and Downing, Hopkins & Co. made it.'' D. A. Honeyman, who had been employed by defendants as bookkeeper, appearing as plaintiff's witness, testified on cross-examination that when a customer lost $20, his account was charged and the defendants' ''grain account'' credited with that sum, and such gains are included in said sum of $105,000; that the defendants also charged their customers a commission of one eighth or one fourth of a cent per bushel for grain bought or sold on their account; and that in ''spread'' wheat transactions the defendants robbed their customers of one eighth or one fourth per cent.

A careful examination of the testimony introduced by the plaintiff shows that defendants falsely represented to their customers that all orders received for the purchase of grain were transmitted by telegraph to the Chicago Board of Trade, and, after the commodity had been thus secured, orders for the sale thereof were sent in the same manner, for which the defendants charged a commission of one eighth or one fourth of a cent

a bushel; that but few of such orders were ever sent, the defendants "crossing" in their office orders for the purchase of wheat with orders for the sale thereof, whereby they secured two commissions without performing any service therefor. The defendants, without crossing such orders or sending them away, also carried risks themselves, and by this means, and the alleged commissions adverted to, secured from their customers, within thirteen months, the sum of $105,000. The methods pursued by them were fictitious, and, notwithstanding the plaintiff now claims to know that this money was improperly secured, he desires to ratify the illegality, and to recover a share of the unlawful gains. It will be remembered that he testified that about April, 1896, the defendants informed him they were crossing orders, but that he supposed that such a course was proper. The testimony shows that he had been engaged with Downing at Portland in the same business before the latter formed a partnership with Hopkins, and to concede the truth of his statement is either not doing credit to his intelligence, or to admit that his moral sense was so blunted by the business in which he was engaged that he could not distinguish between right and wrong. He admits that he sent but few of the orders received to Chicago, and, while he intimates that one of his employers was also a telegrapher, he does not attempt to show that the latter ever sent an order for the purchase or sale of grain. We think it clearly appears that he knew his employers' method of doing business was contrary to public policy during all the time he was engaged by them, and that he received a percentage of the commissions which they pretended to have collected, knowing that they were illegal, and when he discovered that the defendants were deceiving him as well as their customers he also seeks to secure a share of the gains of which he was defrauded.

1. It is contended by plaintiff's counsel, however, that, the unlawful method adopted by defendants to collect the sum of $105,000 not having been alleged as a defense, it was optional with the trial court to consider the illegality claimed to appear from an examination of the testimony, and that, such court

having refused to exercise the option, its action in this respect is not subject to review. The answer not having set up the illegality now relied upon, the defendants are not entitled, as a matter of right, to take advantage of their own wrong: *Ah Doon* v. *Smith*, 25 Or. 89 (34 Pac. 1093). In *Miller* v. *Hirschberg*, 27 Or. 522 (40 Pac. 506), it was held that where a bailee, by mistake, delivers to another wheat belonging to a third person, and, upon the transferee's refusal to return the grain sues him, the court will not, on its own motion, for reasons of public policy, dismiss the action on the ground that the plaintiff violated the statute making it a crime for a warehouseman to remove from his custody any grain for which a receipt has been given without the consent of the owner. Mr. Chief Justice BEAN, speaking for the court, in deciding that case, says: ''The rule seems to be quite well settled that courts will refuse, on grounds of public policy and good morals, to enforce an illegal or immoral contract, or to sustain an action when its object is to enforce the provisions of an engagement prohibited by law; but this case is not strictly of that character. It is rather in disaffirmance of the illegal act of delivering the wheat to the defendant, and does not grow out of any contract or agreement in violation of the statute, but arises from the fact that the defendant has received, through mistake, and converted to his own use, property which belonged to Bentley as bailee. It is true the violation of the statute made it possible for the defendant to convert the wheat, but there was no actual criminal or fraudulent intent on the part of Bentley, and therefore plaintiff ought not to be summarily turned out of court, and the defendant thereby escape liability, because Bentley may have been technically guilty of a crime in putting it within his power to appropriate the wheat. Having received it from Bentley without any lawful right thereto, and converted it to his own use, it seems to us the court ought not, of its own motion, to interpose in his behalf on the ground of a violation of the statute, and thus allow him to reap the benefit of his own wrongful act. If he intended to rely upon such a defense, he should have set it up in his answer, and, not having done so,

the court will not make it for him." In that case the crime incidentally involved consisted in an unintentional violation of the statute, resulting from a mistake of fact caused by delivering to a person a greater quantity of wheat than he was entitled to receive. The effect of that decision, so far as it applies to the enforcement of the terms of a contract express or implied, is that public policy is not violated to such an extent as to require a dismissal of the action *sua sponte,* unless there has been an intentional omission of some duty enjoined, or the willful commission of some offense prohibited by law. In the case at bar, however, the defendants' neglect to transmit to the Chicago Board of Trade orders received from their customers to purchase or sell grain, and the collection from them of commissions for such pretended service, cannot be ascribed to any mistake of fact or lack of criminal intent.

2. The rule is well settled in this state that, where it appears from the plaintiff's own case, or by proper plea of the defendant, that the contract which is the subject of the suit or action is *contra bonos mores* the court will not lend its aid to enforce it on the one hand or to give relief on the other: *Buchtel* v. *Evans,* 21 Or. 309 (28 Pac. 67) ; *Ah Doon* v. *Smith,* 25 Or. 89 (34 Pac. 1093) ; *Bradtfeldt* v. *Cooke,* 27 Or. 194 (40 Pac. 1, 50 Am. St. Rep. 701) ; *Pacific Livestock Co.* v. *Gentry,* 38 Or. 275 (61 Pac. 422, 65 Pac. 597).

3. The contract sought to be enforced in the case at bar being executed, and its illegality apparent from the plaintiff's own case, the question arises, is the failure of the lower court to dismiss the action because it violates public policy reviewable, inasmuch as the question of dismissal on that ground was not presented to or considered by that court? It will be remembered that the testimony was taken before one referee, and findings therefrom made by another. The transcript and bill of exceptions contain 1,276 pages, 485 of which are occupied in transcribing the memoranda furnished by defendants and kept by plaintiff, from which the percentage of commissions was computed and paid monthly to him. The notes so kept contain the names of eighty-six customers, and show that each placed

from one to eighty orders with the defendants for the purchase or sale of wheat; in all, 1,376 separate transactions. It is not reasonable to suppose that the lower court, in examining the testimony and findings made therefrom, involving the volume indicated, could, in the press of business incident to the proper discharge of its duties, give to such a case the degree of care exercised by this court; but, if it be assumed that it received from that court the consideration which its importance demands, its conclusion upon the question of public policy is not the exercise of discretion, but a judgment involving the determination of a question of law, and therefore reviewable.

Believing, as we do, that the contract sought to be enforced violated public policy; that plaintiff, at all times during his said employment, was aware thereof, although without knowledge of the extent of the illegal gains,—it follows that the judgment must be reversed, and the cause remanded, with instructions to dismiss the action.        REVERSED.